**UNITED STATES of America,
Plaintiff,**

v.

**Mark B. MERTON, a/k/a Mark B. Williams, Alexander S. Rector, and Will Lancaster, Defendants**

**United States of America, Plaintiff,**

v.

**John D. Sposit, Nathan J. Kern, and David Login, Defendants.**

**United States of America, Plaintiff,**

v.

**John D. Sposit, Copy W. Hynes, Megan M. Schey, Reynaldo R. Mendoza, Shawn Sweeney, Nathan J. Kern, Shawn Hartnett, Justin C. Lynes, Ryan J. Krueger, Daniel McDermott, Frank E. Edmonds, Liana R. Parisi, a/k/a Liana Wettlaufer, Nathan W. Burress, Lisa Rainey, and Tony Grant, Defendants.**

**United States of America, Plaintiff,**

v.

**Mark B. Merton, a/k/a Mark B. Williams, Vladislav Radosavljevic, Elijah D. Williams, Chad D. Kelly, Juan Jose Ceja–Ponce, a/k/a "Orlando," Jason M. Price, Peter Tiamzon, Stanley Corey Jackson, Jimmy D. Gra-**

ham, Bradley A. Benham, Daniel J. Chum, Douglas D. Fritchel, Cory W. Hynes, Loretta Lim, Kerbin G. Sharp, Christine M. Sloan, Candi Jean Vastlik, Donovan Garcia, Cory Rogers and Toby Khamvongsa, Defendants.

United States of America, Plaintiff,

v.

Jason M. Price, David Price, Chad Vice, Johnny Keiser and David Strauss, Defendants.

United States of America, Plaintiff,

v.

Edward J. Gleason, Defendant.

United States of America, Plaintiff,

v.

Juan Jose Ceja–Ponce and Braulio Medina–Garcia, Defendants.

Nos. CR. 01–CR–317–D, CR. 01–CR–318–D, CR. 01–CR–319–D, CR. 01–CR–320–D, CR. 01–CR–350–D, CR. 01–CR–358–D, CR. 01–CR–359–D.

United States District Court, D. Colorado.

July 31, 2003.

**1162**

Joseph T. Urbaniak, Jr., United States Attorney's Office, Denver, CO, for Plaintiff.

Robert Seldis Berger, Robert S. Berger, P.C., Denver, CO, Patrick McGinnis, Marc Milavitz, The Alternative Law Office of Marc Milavitz, Boulder, CO, for Defendants.

## ORDER

DANIEL, District Judge.

THIS MATTER comes before the Court on Defendants' motions to suppress evidence obtained through twelve separate wiretaps and extensions thereto authorized by Senior United States District Judges Zita L. Weinshienk and John L. Kane, Jr. The Court held evidentiary hearings on these motions on April 30, May 1, 29 and 30, 2002. Having now carefully considered and evaluated the wiretap pleadings (Ap-

plications, Affidavits and Orders), Defendants' motions, the Government's responses, the testimony and evidence adduced, oral arguments, and the applicable law, it is Ordered, for the reasons set forth below, that Defendants' motions are **DENIED.**[1]

## I. BACKGROUND INVESTIGATION

The investigation which ultimately led to the wiretaps at issue in this case began in August 2000 in Colorado Springs, Colorado, with the arrest of Jeremy Dieffenbach. Dieffenbach provided information which led to the identification of John Sposit ("Sposit") as a major supplier of 3, 4–Methylenedioxymethamphetamine ("MDMA") (commonly referred to as "Ecstasy") for distributors throughout Colorado. Based on that information, after months of collecting additional evidence against Sposit, investigators applied for and received authorization to conduct electronic surveillance of Sposit's cellular telephone.

## II. WIRETAPS

### A. FIRST WIRETAP: SUBJECT TELEPHONE ONE, 01–WT–01–Z (ISSUED FEBRUARY 14, 2001)

This First Wiretap order authorized the interception of communications from cellular telephone number (303) 844–8142, subscribed to Tom Snyder, 8220 W. Eastman Place, Denver, Colorado ("First Wiretap"). That cellular telephone was allegedly in the possession of and utilized by John Sposit. The named interceptees in the First Wiretap were John Sposit, Nathan Kern, Reynaldo Mendoza, Luis Hurtado, John Gerak, Megan Schey, Cory Hynes, Tony Stoker, Shawn Hartnett, Shawn Sweeney, Nathan Burress, and Lisa Twoeagles. The wiretap terminated on March 16, 2001. An extension was grant-

---

**1.** To the extent certain Defendants have moved to join Co–Defendants' motions to suppress, the motion of the joining Defendant is

disposed of in the same manner as those briefed and argued by counsel.

ed on March 20, 2001, and added Ryan Krueger, Justin Lynes, Liana Parisi, and Caine Knapp to the list of named interceptees. A final extension was granted on April 18, 2001, and added John Georges, Elijah D. Williams, Brad Benham, Tyler Fader, Frank Edmonds, Angel LNU (last name unknown), Pamela LNU, and Mo LNU to the list of named interceptees.

### B. SECOND WIRETAP: SUBJECT TELEPHONE TWO, 01–WT–02–K (ISSUED MARCH 1, 2001)

The Second Wiretap order authorized the interception of communications from cellular telephone number (720) 220–8700, subscribed to Cristin Irwin, 8196 W. Eastman Place, Lakewood, Colorado ("Second Wiretap"). That cellular telephone was allegedly in the possession of and utilized by John Sposit. The named interceptees included John Sposit, Nathan Kern, Reynaldo Mendoza, Luis Hurtado, John Gerak, Megan Schey, Cory Hynes, Tony Stoker, Shawn Hartnett, Shawn Sweeney, Nathan Burress, and Lisa Twoeagles. The second wiretap terminated on March 31, 2001.

### C. THIRD WIRETAP: SUBJECT TELEPHONES THREE AND FOUR, 01–WT–04–Z (Issued MARCH 23, 2001)

The Third Wiretap order authorized the interception of communications from: (1) cellular telephone number (303) 249–1323, subscribed to Ben Coleman, P.O. Box 97061, Redmond, Washington; and (2) cellular telephone number (720) 217–6919, subscribed to Cory Hynes, P.O. Box 22614, Denver, Colorado (hereinafter collectively referred to as the "Third Wiretap"). Both cellular telephones were allegedly in the possession of and utilized by Cory Hynes.

The named interceptees in the Third Wiretap were John Sposit, Nathan Kern, Reynaldo Mendoza, Luis Hurtado, John Gerak, Megan Schey, Cory Hynes, Tony Stoker, Shawn Hartnett, Shawn Sweeney, Nathan Burress, Lisa Twoeagles, Ryan Krueger, Justin Lynes, Liana Parisi, Caine Knapp, and John Georges. The Third Wiretap terminated on April 21, 2001.

### D. FOURTH WIRETAP: SUBJECT TELEPHONE FIVE, 01–WT–09–Z (ISSUED APRIL 13, 2001)

The Fourth Wiretap order authorized the interception of communications from cellular telephone number (303) 523–9536, subscribed to Yer Yang, 3641 W. 88th Way, Westminster, Colorado, and allegedly in the possession of and utilized by Mark Williams. The named interceptees were Mark Williams, John Sposit, Nathan Kern, Reynaldo Mendoza, Luis Hurtado, John Gerak, Megan Schey, Cory Hynes, Tony Stoker, Shawn Hartnett, Shawn Sweeney, Nathan Burress, Lisa Twoeagles, Ryan Krueger, Justin Lynes, Liana Parisi, Caine Knapp, John Georges, Elijah Williams, Brad Benham, Tyler Fader, Frank Edmonds, Angel LNU, Pamela LNU, and Mo LNU.

### E. FIFTH WIRETAP: SUBJECT TELEPHONE SIX, 01–WT–11–Z (ISSUED MAY 18, 2001)

On May 18, 2001, Judge Weinsheink entered an order authorizing the interception of electronic communications from cellular telephone number (303) 921–2020, subscribed to Gina Madrid, 8350 E. Crescent Parkway, Suite 400, Englewood, Colorado ("Fifth Wiretap"). That cellular telephone was allegedly in the possession of and utilized by Mark Williams.[2] The Fifth

---

2. The named interceptees in the Fifth Wiretap were Mark Williams, Jason Price, John Sposit, Nathan Kern, Reynaldo Mendoza, Luis Hurtado, Megan Schey, Cory Hynes, Tony Stoker, Shawn Hartnett, Shawn Sweeney, Nathan Burress, Lisa Twoeagles, Ryan Krueger, Justin Lynes, Liana Parisi, Caine Knapp, John Georges, Elijah Williams, Brad Benham, Tyler Fader, Frank Edmonds, Angelique Vin-

Wiretap commenced on May 22, 2001, and terminated on May 23, 2001.

### F. Sixth Wiretap: Subject Telephone Seven, 01–Wt–12–Z (issued May 24, 2001)

On May 24, 2001, Judge Weinshienk authorized the interception of communications from cellular telephone number (303) 885–3168, subscribed to Jason Price, 4050 S. Holly Street, Englewood, Colorado ("Sixth Wiretap") and allegedly in the possession of and utilized by Jason Price.[3] The interception of the Sixth Wiretap terminated on June 22, 2001.

### G. Seventh Wiretap: Subject Telephone Eight, 01–Wt–15–Z (issued June 4, 2001)

On June 4, 2001, Judge Weinshienk authorized the interception of communications from cellular telephone number (303) 726–5300, subscribed to Gina Madrid, 8350 E. Crescent Parkway, Suite 400, Englewood, Colorado. That cellular telephone was allegedly in the possession of and utilized by Mark Williams.[4] The interceptions of the Seventh Wiretap commenced on June 5, 2001, and terminated shortly thereafter.

### H. Eighth Wiretap: Subject Telephone Nine, 01–Wt–17–Z (issued June 13, 2001)

The Eighth Wiretap authorized the interception of communications from cellular telephone number (720) 840–8090, subscribed to RG/MM, Inc., 612 Washington St., Suite 107, Denver, Colorado, which was allegedly in the possession of and utilized by Mark Williams.[5] The interceptions on the Eighth Wiretap terminated on July 12, 2001, and an extension was granted on the same day.[6] The extension of the Eighth Wiretap terminated on August 10, 2001.

### I. Ninth Wiretap: Subject Telephone Ten, 01–Wt–18–Z (issued June 26, 2001; extended On July 25, 2001)

The Ninth Wiretap order authorized the interception of communications from cellular telephone number (303) 347–1869, subscribed to Vladiflav Radosavljevic, 6498 W. Arbor Dr., Littleton, Colorado, which was allegedly in the possession of and utilized by Vladislav Radosavljevic.[7] An extension for the Ninth Wiretap was granted on July 25, 2001. The named interceptees in the extension of the Ninth Wiretap were Vladislav Radosavljevic, Mark Williams, Corey

---

ther, Pamela Watson, Moses Williams, Ismael Asuncion, Armando Castanon, Paul Chapman, Daniel Chum, Curt Cook, Lindsey Eckley, Jennifer Fortenberry, Doug Fritchell, Shannon Grammar, Cameron Gray, Corey Jackson, Chad Kelly, Stanislav Stamenkovic, Heather Moore, Vladislav Radosavljevic, Alex Rector, Lance Slayton, Christie Sloan, Park Townes, Michael Andre, Jimmy Graham, Jose LNU, Orlando LNU, Steve LNU, Si LNU, Phoebe LNU, Peter LNU, Jeff LNU, Randy LNU, Kenny LNU, and Kerbin LNU.

3. The named interceptees were the same as in the Fifth Wiretap except for the omission of Jimmy Graham and the addition of Jimmy LNU and Tod Holley.

4. The named interceptees were the same as those in the Fifth Wiretap with the addition of Tod Holley.

5. The named interceptees were the same as those listed in the Seventh Wiretap.

6. The interceptees named in the extension were the same individuals named in the original Affidavit.

7. The named interceptees were the same as for the Eighth Wiretap with the addition of Chad Vice, Srdjan Josimov, Tihomir Josimov, Peter Tiamzon, Jeffery Tiamzon, Jacki Ben Yakar, Jose LNU, Orlando LNU, Steve LNU, Si LNU, Phoebe LNU, Randy LNU, Kenny LNU. Kerbin LNU is identified as Kerbin Sharp.

Jackson, Stanislav Stamenkovic, Srdjan Josimov, Tihomir Josimov, Mario Marjanac, Dragan Kojic, and Djole LNU. The extension terminated on August 23, 2001.

### J. Tenth Wiretap: Subject Telephone Eleven, 01–Wt–19–Z (issued July 11, 2001)

The Tenth Wiretap order authorized the interception of communications from cellular telephone number (720) 244–6737, subscribed to Jason D. Holley, 2964 E. Floyd Dr., Denver, Colorado ("Tenth Wiretap"). That cellular telephone was allegedly in the possession of and utilized by Jason Price. The named interceptees in the Tenth Wiretap are Jason Price, Mark Williams, Tod Holley, Jim Dowd, Ed Gleason, Johnny Keiser, David Kole, Damon Newman, Julie Payne, David Price, John Studebaker, Chad Vice, Andre Walker, Cliff Houser, Quincy Bentley, Steve LNU, and Gonzo LNU. The Tenth Wiretap terminated on August 10, 2001.

### K. Eleventh Wiretap: Subject Telephone Twelve, 01–Wt–21–Z (issued July 18, 2001)

The Eleventh Wiretap order authorized the interception of communications from cellular telephone number (303) 898–1178, subscribed to Jaon Hicks, 16794 E. Happy Canyon, Englewood, Colorado ("Eleventh Wiretap"). That cellular telephone was allegedly in the possession of and utilized by Mark Williams.[8] The Eleventh Wiretap terminated on August 21, 2001.

### L. Twelfth Wiretap: Subject Telephone Thirteen, 01–Wt–22–Z (issued August 16, 2001)

The final wiretap order authorized the interception of communications from cellular telephone number (303) 944–5314, subscribed to Francisco Vasquez, 11821 Elm Drive, Thorton, Colorado ("Twelfth Wiretap") and commenced on August. 16, 2001. That cellular telephone was allegedly in the possession of and utilized by Juan Ceja–Ponce. The named interceptees in the Twelfth Wiretap were Juan Ceja–Ponce a/k/a Orlando LNU, Mark Williams, Ismael Asuncion, Douglas Lindell, Jimmy Graham, Hector Lascina, and Jose LNU.

## III. The 'Necessity' Requirement

▮ Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III") governs the use of wiretaps and the evidence obtained therefrom. 18 U.S.C. §§ 2510 et seq. "In order to prove that a wiretap is necessary, the government must show that traditional investigative techniques have been tried unsuccessfully, reasonably appear to be unsuccessful if tried, or are too dangerous to attempt." *United States v. Ramirez–Encarnacion*, 291 F.3d 1219, 1222 (10th Cir.2002) (citing 18 U.S.C. §§ 2518(1)(c), 2518(3)(c)). "A wiretap authorization order is presumed valid, and the defendant bears the burden of proof to show otherwise." *United States v. Radcliff*, 331 F.3d 1153, 1160 (10th Cir.2003). A successful challenge to the necessity of a wiretap results in the suppression of evidence obtained pursuant

---

**8.** The named interceptees were Mark Williams, Jason Price, John Georges, Elijah Williams, Brad Benham, Ismael Asuncion, Armando Castanon, Paul Chapman, Daniel Chum, Curt Cook, Lindsey Eckley, Jennifer Fortenberry, Doug Fritchell, Shannon Grammar, Cameron Gray, Corey Jackson, Chad Kelly, Stanislav Stamenkovic, Heather Moore, Vladislav Radosavljevic, Alex Rector, Lance Slayton, Christie Sloan, Michael Andre, Jimmy Graham, Betty Nguyen, Cliff Houser, Cory Hynes, Hector Lascina, Jim Santucci, Peter Tiamzon, Jeffery Tiamzon, Kerbin Sharp, Jose LNU, Toby LNU, Shane LNU, Donny LNU, Orlando LNU, Si LNU, Phoebe LNU, Randy LNU, and Kenny LNU.

to that wiretap. *Ramirez–Encarnacion,* 291 F.3d at 1222.

■ The traditional investigative techniques to be considered by a district court in reviewing the necessity requirement were identified in *Ramirez–Encarnacionas:*

> "(1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; [ ] (4) infiltration of conspiratorial groups by undercover agents or informants" and (5) "[p]en registers and trap and trace devices."

*Id.* at 1222 n. 2. "If any of these traditional investigative techniques has not been tried, the government must explain why with particularity." *Id.* at 1222 (citing *United States v. Mitchell,* 274 F.3d 1307, 1310 (10th Cir.2001)). The Tenth Circuit has also stated that " 'it is not necessary for the government formally to address each category with an explanation ... if it is clear, under the government's recitation of the facts of the case, that requiring the government to attempt the unexhausted and unexplained normal investigative techniques would be unreasonable.' " *United States v. Garcia,* 232 F.3d 1309, 1313 (10th Cir.2000) (quoting *United States v. Castillo–Garcia,* 117 F.3d 1179, 1188 (10th Cir. 1997)).

■ For the most part, the Defendants contend that all of the evidence obtained from each wiretap in this case should be suppressed because the Government failed to satisfy the necessity requirement. The Defendants' necessity arguments fall into two categories: (1) challenges to the facial validity of wiretap authorizations; and (2) subfacial challenges to the wiretap authorizations. As to the first category of challenges, a district court confines its analysis to the information before the issuing judge. *United States v. Oregon–Cortez,* 244 F.Supp.2d 1167, 1172 (D.Colo.2003). Under this analysis, a district court "examines *de novo* whether 'a full and complete statement' was submitted meeting § 2518(1)(c)'s requirements and reviews for an abuse of discretion the issuing judge's conclusion under § 2518(3)(c) that the wiretaps were necessary." *Id.; accord Ramirez–Encarnacion,* 291 F.3d at 1222 n. 1.

■ In contrast to the first category of challenges to necessity, the second category of challenges proceeds under the framework of *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and permits the district court to adduce evidence that was not before the issuing judge. *Oregon–Cortez,* 244 F.Supp.2d at 1171–72 n. 4; *United States v. Small,* 229 F.Supp.2d 1166, 1179, 1189–90 (D.Colo.2002). However, to be entitled to such a hearing, a defendant must make a "substantial preliminary showing" that the affiant included a false statement in the wiretap affidavit, either knowingly and intentionally or with reckless disregard for the truth, and that this misstatement was necessary to the finding of probable cause or necessity. *Id.* A material omission in the wiretap affidavit may also qualify for a *Franks* hearing if the same requisite showing is made. *United States v. Green,* 175 F.3d 822, 828 (10th Cir.1999).

In this case, I held hearings before the decisions in *Ramirez–Encarnacion* and *Oregon–Cortez* were published, which clarified when an evidentiary hearing on necessity is required. At the time of the hearings in this case, I still adhered to the practice (which has since been discontinued) of holding evidentiary hearings on necessity without first requiring the Defendants to satisfy the threshold for a *Franks* hearing. *See Oregon–Cortez,* 244 F.Supp.2d at 1170–71. Although I conclude from my subsequent review of the

Defendants' *Franks* challenges that they should not have been entitled to such a hearing, the evidence adduced at those hearings does not alter my conclusion that the necessity requirement has been satisfied here. *See* Section IV, *infra.*

■ I will now analyze the challenges to the facial validity of wiretap authorizations by examining *de novo* whether a "full and complete statement" was submitted meeting § 2518(1)(c)'s requirements and by reviewing for an abuse of discretion Judge Weinshienk's and Judge Kane's conclusions under § 2518(3)(c) that the wiretaps were necessary. *Oregon–Cortez,* 244 F.Supp.2d at 1172. My review is limited to the information before the issuing judges, to wit, the Applications, Affidavits and Orders authorizing the wiretaps as well as the testimonial evidence introduced at the *in camera* proceedings before the issuing judge.[9] *Id.*

### A. *FACIAL CHALLENGES TO THE WIRETAPS*

#### (i.) FIRST WIRETAP: SUBJECT TELEPHONE ONE, 01–WT–01–Z, FEB. 14, 2001.

Defendants move to suppress evidence obtained through the use of electronic surveillance, arguing that the First Wiretap was unnecessary and therefore improper because the Government had successfully utilized traditional investigative techniques prior to the initiation of the First Wiretap. Defendants claim that the Superseding Indictment reflects their supposition; twelve of the Counts against Sposit allege conduct that precedes in time the commencement of the First Wiretap.

■ The Defendants' argument incorrectly assumes that the purpose of the First Wiretap was only to obtain evidence of the sort that the Government had succeeded in obtaining through traditional investigative techniques used with limited

success. The First Wiretap, however, was sought and authorized in order to allow investigators to intercept conversations thought necessary to explore matters that the Government had not successfully investigated through traditional techniques. These matters included the identification of all Sposit's suppliers, co-conspirators and distributors; the locations used by Sposit and others to distribute controlled substances; and the times of the delivery of controlled substances into and within the District of Colorado. Affidavit for the First Wiretap, February 14, 2001 ("Aff. of Feb. 14, 2001"), ¶ 12. The Affidavit contained sufficient evidence to support a conclusion that traditional investigative techniques had been tried and failed or were unlikely to provide evidence of these matters.

Specifically, the Affidavit explains that investigators conducted surveillance on Sposit for several months preceding the commencement of the First Wiretap. Agents observed confidential informants and an undercover agent make controlled purchases of Ecstasy from Sposit. *Id.* at ¶¶ 30–31, 33, 35, 46. Sposit was also observed meeting with his alleged co-conspirators in a manner consistent with money or drug transactions. *Id.* at ¶¶ 46, 53–55. Surveillance was additionally conducted on Sposit's alleged co-conspirators, including Megan Schey, Shawn Sweeney, Nathan Burress, and Lisa Twoeagles. *Id.* at ¶¶ 42, 44, 47–50, 52. The Affidavit also explains that DEA agents in San Francisco had conducted surveillance on Nathan Kern, Sposit's alleged Ecstasy source. *Id.* at ¶ 72. Finally, the Affidavit describes the shortcomings of this surveillance and why continued surveillance would not adequately meet the objectives of the investigation. *Id.* at ¶¶ 75–81. For the most part, sur-

---

9. The Affiant in these Affidavits was Drug Enforcement Administration Special Agent Paul J. Roach ("Agent Roach" or the "Affiant").

veillance merely revealed the suspects in the company of other persons allegedly involved in the conspiracy. *Id.* at ¶¶ 42, 46, 53–55.

The Affidavit also describes the results of questioning and interviewing witnesses and participants prior to the First Wiretap. The Affidavit indicates that Dieffenbach, as well as two individuals who ultimately became cooperating sources, CS–1 and CS–2, provided investigators with valuable information regarding Sposit's organization. *Id.* at ¶¶ 21–28, 38–39. Though this information was integral to the initial success of the investigation, it proved to be limited to their personal involvement with Sposit's organization. *Id.* at ¶ 92. They were unable to provide any information regarding the highest level of Sposit's organization, particularly his Ecstasy source. *Id.* Investigators also attempted to interrogate or question Shawn Hartnett following his arrest on February 6, 2001, while in possession of 20,000 Ecstasy pills. *Id.* at ¶ 66. Although agents believed that Hartnett was a courier for Sposit's alleged MDMA source, Nathan Kern, they were unable to inquire about Hartnett's relationship with Sposit because he requested an attorney and refused to cooperate with agents. *Id.*

The Affidavit also explains why investigators rejected issuing grand jury subpoenas or granting immunity in this case. *See* Aff. of Feb. 14, 2001, at ¶ 93. Investigators speculated that if the suspects were called to testify before the grand jury, they would most likely be uncooperative and invoke their Fifth Amendment privilege not to testify. *Id.* Further, the Affidavit describes investigators' concern that offers of immunity might preclude prosecution of individuals who could later be revealed as the most culpable in Sposit's organization. *Id.*

The Affidavit describes why investigators rejected using search warrants to obtain evidence against Sposit's organization. Although Agent Roach believed he had probable cause to search Sposit's home address and another residence associated with the organization, he also believed that the execution of search warrants would be premature and deleterious to the ongoing investigation. *Id.* at ¶¶ 82–86. Investigators had observed Sposit travel directly from his residence to drug transactions, but they did not have proof that he used his residence as a storage facility for large quantities of Ecstasy. *Id.* at ¶ 84.

The Affidavit describes the use of two cooperating sources, CS–1 and CS–2. *Id.* at ¶¶ 89–90. The Affidavit also indicates that investigators received reliable information from an individual ("California CS") cooperating with DEA agents in San Francisco. *Id.* at ¶ 67. CS–1 was a tremendous asset to investigators as he/she provided detailed information on Sposit's methods for conducting drug transactions and Sposit's new telephone number and also introduced an undercover agent to Sposit. However, the Affidavit explains that CS–1's knowledge is limited to his/her direct involvement with Sposit. *Id.* at ¶ 90. CS–1 does not have knowledge of Sposit's Ecstasy source, Ecstasy distributors, or what Sposit did with drug proceeds. *Id.*

The Affidavit also explains that CS–2's assistance and knowledge of Sposit's organization was limited. CS–2 did not have contact with Sposit and only dealt with Shawn Sweeney. *Id.* at ¶¶ 38–46. Although information provided by CS–2 helped investigators determine that Sweeney obtained Ecstasy from Megan Schey, an alleged distributor for Sposit, CS–2 could not provide any information on Sposit or any member of his organization other than Sweeney. *Id.* at ¶¶ 45–46, 89.

The Affidavit also describes the use of two undercover agents, Task Force Officer

Patrick McElderry ("TFO McElderry") and Special Agent Jennifer Cotter ("Agent Cotter"), during the pre-wiretap investigation. *Id.* at ¶¶ 25–46. TFO McElderry and CS–1 were able to purchase Ecstasy directly from Sposit. *Id.* at ¶ 33. However, after Agent Cotter, acting as TFO McElderry's girlfriend, paid Sposit for the Ecstasy pills obtained on consignment, Sposit would no longer deal with TFO McElderry and Agent Cotter directly. *Id.* at ¶¶ 37, 96. Sposit informed CS–1 that he was leery of Agent Cotter and that TFO McElderry should deal with Sposit's subordinates. *Id.* The Affidavit states Agent Roach's belief that Sposit was insulating himself from criminal liability by having drug buyers deal with lower-level members of his organization. *Id.* at ¶ 97. Further, the Affidavit explains that TFO McElderry and Agent Cotter were not able to determine the full scope of Sposit's organization or to identify the individuals supplying the organization with Ecstasy. *Id.* at ¶¶ 94, 97.

The Affidavit also describes the use of pen registers and trap and trace devices during the pre-wiretap investigation. *Id.* at ¶¶ 46, 67–68, 70, 72, 98–100. Agents collected and analyzed the information obtained from this investigative technique to identify the individuals who called or were called by Sposit's telephone. *Id.* at ¶ 72. This information confirmed that Sposit was in contact with individuals who were suspected associates in the organization, but it could not reveal the nature of the contacts. Thus, these investigative techniques merely confirmed the investigators' suspicions without providing additional information regarding the scope of the organization.

Finally, the Affidavit explains that investigators also checked public records for Sposit and performed "trash runs" on his residence. *Id.* at ¶¶ 22, 24, 101. Investigators collected and examined discarded trash at Sposit's residence on three occa-sions: October 30, 2000; November 28, 2000; and January 5, 2001. *Id.* at ¶ 101. On one occasion, agents found a clear plastic bag that contained a green powdery residue which tested positive for MDMA. *Id.* Nothing else of significant evidentiary value was discovered from Sposit's trash.

Based on my *de novo* review, I find that the Government provided a "full and complete statement" meeting § 2518(1)(c)'s requirements. I also find that Judge Weinshienk did not abuse her discretion in concluding under § 2518(3)(c) that the first wiretap was necessary.

**(ii.) SECOND WIRETAP: SUBJECT TELEPHONE TWO, 01–WT–02–K, MARCH 1, 2001.**

Investigators confirmed during the interceptions of Subject Telephone One that Sposit was using different cell phones interchangeably. *See* Affidavit for the Second Wiretap, March 1, 2001 ("Aff. of Mar. 1, 2001,"), ¶ 85. An analysis of the trap and trace and pen register data, together with the interceptions on Subject Telephone One, indicated that Sposit would place and receive calls on both Subject Telephones One and Two sometimes within minutes of one another. Agent Roach believed that Sposit's interchangeable use of various cell phones was intended to thwart law enforcement's efforts to detect Sposit's criminal activity. *Id.* at ¶ 74. Agent Roach also believed that the Title III wiretap on Subject Telephone One was only providing agents with a partial picture of Sposit's organization. Thus, for the same reasons identified in the Application and Affidavit for the wiretap on Subject Telephone One, it was Agent Roach's belief that a wiretap on Subject Telephone Two was necessary to successfully achieve the objectives of the investigation. *Id.*

▮▮ Common sense influences my decision here; a necessity finding for Subject

Telephone One goes a long way toward satisfying the necessity requirement for Subject Telephone Two. The Application to intercept communications on Subject Telephone Two was submitted only two weeks after the commencement of the First Wiretap and contains most if not all of the information set forth in the Affidavit submitted in support of the Application for the First Wiretap. The target, named interceptees and objectives for this wiretap were identical to the target, named interceptees and objectives for the First Wiretap. Moreover, the information obtained during the interception of the First Wiretap demonstrated that Sposit's organization continued to operate in the same manner as described in the Application and Affidavit for the First Wiretap.

Specifically, the Affidavit describes new information obtained during the first few days of interceptions on the First Wiretap. It detailed an alleged drug transaction involving Sposit, Hynes and Mendoza. *Id.* at ¶¶ 82–85. Investigators believed that Sposit obtained Ecstasy from Hynes and then provided the Ecstasy to Mendoza for distribution. *Id.* This alleged drug transaction additionally demonstrated that Sposit was placing calls on both Subject Telephones One and Two in furtherance of his criminal activities. *Id.* at ¶ 85. The Affidavit also details the pen register and trap and trace data for Subject Telephone Two. *Id.* at ¶ 73.

The Application and Affidavit for a wiretap on Subject Telephone Two contains the same information set forth in the Affidavit for the First Wiretap and sufficiently reflects that even after the commencement of the First Wiretap, the continued use of traditional investigative techniques was unlikely to advance the investigation. As of the date of the Application for the Wiretap on Subject Telephone Two, the First Wiretap had not yet met the aims of the investigation. Accordingly, based on my

*de novo* review, I find that the Government provided a "full and complete statement" meeting § 2518(1)(c)'s requirements. I also find that Judge Weinshienk did not abuse her discretion in concluding under § 2518(3)(c) that this wiretap was necessary.

### (iii.) First Extension of the First Wiretap, 01–WT–01–Z, March 20, 2001.

 On March 20, 2001, the Government applied for an extension order for the wiretap on Subject Telephone One. To demonstrate that the extension was necessary, the Government submitted an Affidavit and also incorporated by reference the original Affidavit filed on February 14, 2001. *See* Affidavit for the Extension of First Wiretap, March 20, 2001 ("Aff. of Mar. 20, 2001"), at ¶ 15. Together, the Government claims that these Affidavits contain a "full and complete statement" regarding traditional investigative techniques. Although investigators obtained a great deal of evidence during the first thirty days of interceptions, the Affidavit explains that investigators still did not know the full scope and activities of Sposit's organization. *Id.* at ¶¶ 16, 81. Under 18 U.S.C. § 2518(5), "[e]xtensions of an order may be granted, but only upon application for an extension made in accordance with subsection (1) of this section and the court making the findings required by subsection (3) of this section." Although this Affidavit contains much of the same information from the original Affidavit, I find that it contains a sufficient amount of new information, together with the information in the original Affidavit, to satisfy § 2518(1)(c).

The first extension Affidavit describes the continued use of physical surveillance on Sposit and various members of his organization. *See* Aff. of Mar. 20, 2001, at

¶¶ 20, 22, 33, 47. Surveillance, in conjunction with the interceptions of Subject Telephone One, enabled investigators to determine that Hynes was supplying Sposit with Ecstasy. *Id.* at ¶¶ 20–24. Surveillance also enabled investigators to identify additional members of the organization. *Id.* at ¶¶ 16, 22. However, continued surveillance had not enabled investigators to identify where Sposit stored large quantities of Ecstasy and had not revealed the full extent of the organization. *Id.* at ¶¶ 16, 58–59.

The first extension Affidavit also describes investigators' unsuccessful efforts to interrogate or question known witnesses or participants since the commencement of the First Wiretap. On March 6, 2001, Agent Roach and two detectives from the Boulder County Drug Task Force interviewed Shawn Sweeney regarding the recent death of a teenage girl in Boulder, allegedly caused by the girl's use of Ecstasy. *Id.* at ¶ 37. Sweeney confessed to providing the Ecstasy that the deceased girl and her friends ingested. *Id.* However, Sweeney refused to provide investigators with any detailed information regarding his source of Ecstasy. He stated that he would be killed by his associates for cooperating with law enforcement and that he would rather do twenty years in prison than assist the investigation. *Id.* at ¶¶ 37, 71.

The first extension Affidavit also details an unsuccessful attempt to question and interrogate newly identified participants in the organization. *Id.* at ¶¶ 47–50. On March 8 and 9, 2001, agents intercepted numerous telephone calls concerning a pending Ecstasy transaction involving Sposit. Based on physical surveillance and the intercepted calls, agents believed that Sposit purchased a quantity of Ecstasy from Cory Hynes and subsequently sold a quantity of Ecstasy to an unknown individual driving a blue Pontiac. *Id.* at ¶¶ 42,

47. Agents maintained surveillance on the Pontiac and instructed the Colorado State Patrol to make a traffic stop. *Id.* at ¶ 47. After giving the driver, Ryan Krueger, a traffic warning ticket, the officer searched the car for drugs. *Id.* When the officer requested permission to search the trunk, both Krueger and his passenger, Justin Lynes, claimed they did not have a key. *Id.* Although agents had seen them open the trunk earlier in the evening, agents could not divulge this information without compromising the investigation. *Id.* As such, Krueger and Lynes's evasiveness successfully thwarted agents' efforts to question and interrogate them about their involvement with Sposit's organization. They even bragged to Sposit during an intercepted call that they had emerged unscathed from their confrontation with the state patrol. *Id.* at ¶ 49. Despite the evidence obtained from the intercepted communications and physical surveillance, agents could not even confirm that a drug transaction took place on March 8, 2001. *Id.* at ¶¶ 38–50.

The first extension Affidavit also describes Agent Roach's continued belief that executing a search warrant was unlikely to materially advance the investigation. *Id.* at ¶¶ 60–64. Further, agents did not identify any new residences during the interceptions of the First Wiretap that evidenced sufficient probable cause to execute a search warrant. *Id.*

The first extension Affidavit states that investigators had identified two new cooperating sources since the commencement of the First Wiretap. *See* Aff. of Mar. 20, 2001, at ¶ 67. CS–3 had purchased Ecstasy from Krueger, one of Sposit's associates, in the past. *Id.* On March 16, 2001, CS–3 introduced an undercover agent to Krueger, and the agent was able to purchase a certain quantity of Ecstasy from Krueger. *Id.* Although CS–3 provided

some assistance to the investigation, he/she was unable to provide any information about Krueger's source or involvement in Sposit's organization. *Id.*

Agents also obtained the cooperation of CS–4 since the commencement of the First Wiretap. *Id.* at ¶ 68. CS–4 provided useful information on Sposit's organization, including the identity of Sposit's previous Ecstasy source, Nathan Kern. *Id.* However, CS–4's involvement with Sposit and Kern was limited to marijuana trafficking, and CS–4 incorrectly informed agents that Sposit was no longer distributing Ecstasy. *Id.* On that basis, agents reasonably concluded that the continued use of CS–4 was unlikely to satisfy the investigation's objectives. *Id.* Finally, the first extension Affidavit describes agents' belief that the continued use of pen registers and toll analysis, without continued wire interceptions, would be of limited use. *Id.* at ¶¶ 78–79.

Thus, based on my *de novo* review I find that the Government satisfied § 2518(1)(c)'s "full and complete statement" requirement. I also find that Judge Weinshienk did not abuse her discretion in concluding under § 2518(3)(c) that this extension was necessary.

(iv.) THIRD WIRETAP: SUBJECT TELEPHONES THREE AND FOUR, 01–WT–04–Z, MARCH 23, 2001.

Three days after Judge Weinshienk authorized the first extension of the First Wiretap, the Government applied for and received authorization to intercept wire communications on two telephones in the possession of and utilized by Cory Hynes. Although agents knew that Cory Hynes was involved in Sposit's organization—he was a named interceptee in 01–WT–01–Z, its first extension and 01–WT–02–K—following the interceptions on 01–WT–01–Z, agents believed that Cory Hynes was supplying Ecstasy to Sposit. *See* Affidavit for

Third Wiretap, March 23, 2001 ("Aff. of Mar. 23, 2001") at ¶ 16. The request for a wiretap to investigate the "drug organization run by Cory HYNES" marks a divergence in the investigation. *Id.* at ¶ 12(a).

 As set forth in the Affidavit for this wiretap, and more fully set forth in the Affidavits in support of the First Wiretap and its extension, the Government had used traditional investigative techniques against Hynes almost since the commencement of the investigation against Sposit. The Affidavits describes the use of physical surveillance to track Hynes during suspected drug transactions, (*see, e.g., id.* at ¶¶ 56, 60), and why search warrants would be unsuccessful (*id.* at ¶¶ 64, 66–68). The Affidavits specifically referenced certain confidential informants' knowledge of the Hynes organization and explained why these informants would not aid in the investigation of the organization. *Id.* at ¶¶ 70–74. The Affidavit further indicates that witness interviews provided no information regarding the Hynes organization, and it detailed similar unsuccessful efforts of undercover agents. *Id.* at ¶¶ 75–81.

Thus, based on my *de novo* review, I find that the Government provided a "full and complete statement" meeting § 2518(1)(c)'s requirements. I also find that Judge Weinshienk did not abuse her discretion in concluding under § 2518(3)(c) that this wiretap was necessary.

(v.) FOURTH WIRETAP: SUBJECT TELEPHONE FIVE, 01–WT–09–Z, APRIL 13, 2001.

 The target of this wiretap was the drug organization run by Mark Williams. *See* Affidavit for the Fourth Wiretap, April 13, 2001 ("Aff. of Apr. 13, 2001") at ¶ 12. The Government learned of Mark Williams and his alleged drug trafficking through the wiretaps on the Sposit and Hynes organizations; hence, this wiretap is a "spin-

off" from a known target to a newly discovered target. *United States v. Crumpton,* 54 F.Supp.2d 986, 1007, 1009 (D.Colo. 1999). The Defendants contend that because Mark Williams and his drug organization had never been the subject of an investigation prior to this wiretap application, "the government was required to set forth a 'full and complete statement' ... particularized as to Williams and his organization independent of any necessity that may have been shown relative to the Sposit and Hynes drug organizations." *See* Def. Price Mot., July 1, 2002, p. 37.

The Defendants' interpretation of "independent" is too literal. While it is true that the Government first learned of Mark Williams from wiretapping Hynes's telephone, it does not follow that *all* of the information contained in the Government's "full and complete statement" concerning the Sposit and Hynes organizations is irrelevant to the "full and complete statement" for the Mark Williams wiretap. There is necessarily some overlap in the analysis due to the interrelatedness of the Sposit, Hynes and Mark Williams organizations as reflected in this Affidavit. For example, the cooperating sources and undercover agents used during the Sposit and Hynes investigations failed to identify Hynes's MDMA supplier. Even though this information was known to agents before they considered Mark Williams a target for a wiretap, it is relevant to the Government's explanation as to why their cooperating sources and undercover agents were unlikely to succeed if tried with respect to Mark Williams, the alleged supplier for Hynes.

The Defendants are correct, however, that the Government may not move swiftly from wiretap to wiretap without pausing to consider whether traditional investigative techniques can be used effectively against a newly identified target. *Castillo–Garcia,* 117 F.3d at 1196. This proposition is of particular significance here because the Government only learned of Mark Williams's involvement several weeks before seeking to wiretap his cellular telephone. I reject the Defendants' contention that my analysis here is completely independent of any necessity shown relative to the Sposit and Hynes organizations. Nonetheless, I have examined this Affidavit closely to ensure that the Government paused to consider traditional investigative techniques "particularly in light of any evidence obtained as a result of" the Hynes wiretap, and more specifically, relative to Mark Williams, before it obtained authorization to intercept Mark Williams's telephone calls. *Id.*

As to physical surveillance, the Affidavit describes an instance where law enforcement attempted to establish surveillance on a meeting between Mark Williams and Hynes near St. Luke's Hospital in Denver on March 27, 2001. *See* Aff. of Apr. 13, 2001, at ¶¶ 25–26, 36. The Affidavit describes calls from Mark Williams intercepted on the Hynes wiretap wherein Mark Williams inquired about Hynes's whereabouts. Hynes indicated that he was in the area, but there were "a couple of cars behind me, man, [ ] kind of weird ... and it's a white Ford Taurus[.]" *Id.* at ¶ 25. After Mark Williams ascertained that the car was no longer following Hynes, they agreed to meet at the Hospital. *Id.* The Affidavit indicates that agents were in fact following Hynes in a white Ford Taurus and observed him driving in a manner consistent with counter-surveillance techniques. *Id.* at ¶¶ 26, 36. After the meeting, agents attempted to follow Mark Williams, but he too began driving in a manner consistent with counter-surveillance techniques, and agents terminated the surveillance to avoid detection. *Id.* Thus, the Affidavit describes, with particularity, an instance where surveillance was attempted and failed because Mark

Williams detected agents' efforts. In addition, Mark Williams, at a minimum, suspected that a criminal associate had been followed by agents prior to meeting with him at the hospital.

While it is true, as several Defendants have pointed out, that this Affidavit contains several so-called "boiler plate" paragraphs concerning surveillance which might be applicable to most MDMA investigations (*see, e.g., id.* at ¶ 37), I find that the Affidavit contains sufficient particularized information to establish that standard visual and aural surveillance of the Mark Williams organization had been tried and failed and that future attempts would be unlikely to succeed or too dangerous. It is of particular significance that the Affidavit describes an instance where Mark Williams detected surveillance and engaged in counter-surveillance techniques. *See Castillo–Garcia,* 117 F.3d at 1191, 1192 ("[e]ven assuming arguendo, as we must, that the evening of September 5, 1994, was the one and only time that Ceferino Castillo–Garcia was ever subject to visual surveillance, we find it dispositive that, on that occasion, Ceferino Castillo–Garcia detected the surveillance"). Moreover, the Tenth Circuit interprets the necessity requirement in a "common sense fashion" and takes into account "all of the facts and circumstances" when evaluating whether the Government's showing of necessity was sufficient to justify a wiretap. *Ramirez–Encarnacion,* 291 F.3d at 1222 (internal citations and quotations omitted). Accordingly, I find that the Government sufficiently established that surveillance had been tried and failed, or continued to be used or attempted against the Mark Williams organization but was unlikely to be successful.

This Affidavit and the Affidavits incorporated by reference also demonstrate that the use of cooperating sources or undercover agents had failed or would be reasonably unlikely to succeed. First, as illustrated *supra,* I reject Defendants' contentions that the use of cooperating sources and undercover agents as to the Sposit and Hynes organizations "is largely irrelevant to the showing of necessity to Williams and his organization." *See* Def. Price Mot., Jul. 1, 2002, pp. 40, 42. The Affidavit expressly provides that these cooperating sources "are not in a position to advance the investigation against WILLIAMS and his higher-level criminal associates" and that "no realistic scenario existed by which an undercover agent could be introduced to WILLIAMS." *See* Aff. of Apr. 13, 2001, at ¶¶ 48, 52. These individuals did not know of or interact with Mark Williams, and the Affidavit accurately reflected that they would not be able to provide information which achieves the investigation's objectives. *Id.* at ¶ 46.

Further, the Affidavit indicates that the new cooperating source (CS–5) identified since the Hynes wiretap was unable to materially advance this investigation. *Id.* at ¶¶ 45–48. While this individual provided background information concerning Mark Williams based on his/her connections to and familiarity with the Denver drug community, the Affidavit sufficiently explained why CS–5 would not be of assistance to agents even though he/she could potentially purchase MDMA from Mark Williams. *Id.* The Affidavit describes the agents' belief that it would not benefit the investigation to have CS–5 purchase MDMA from Mark Williams, as he/she had never done so previously and had no knowledge whatsoever of Mark Williams's source of MDMA. *Id.* at ¶¶ 47–48. Accordingly, I find that the Affidavit demonstrates that it would be unreasonable to require agents to locate or develop additional cooperating sources or undercover agents given the posture of the investigation.

Moreover, the Affidavit explains that interviews with known subjects or their associates would not advance the investigation. *Id.* at ¶¶ 49–50. The individuals previously interviewed by the Government were not aware of Mark Williams's role in the alleged drug trafficking and were equally without knowledge of Mark Williams's drug source, one of the objectives of this investigation. *Id.* Therefore, the Affidavit sufficiently explained that questioning and interrogation of witnesses or participants had failed and, if pursued further, were unlikely to succeed.

I also find that the Affidavit demonstrates that it would have been unreasonable to attempt to use a search warrant against Mark Williams or examine his trash. The Affidavit details the agents' desire not to alert Mark Williams to the investigation and expressed their belief that "suspects may [ ] flee, destroy other evidence, or temporarily cease their drug trafficking business" if search warrants were used. *Id.* at ¶¶ 43, 44. Further, the Affidavit states that Mark Williams lived in a condominium, making "trash runs" futile because Mark Williams "does not place trash anywhere where agents could obtain it." *Id.* at ¶ 59.

Moreover, the Affidavit states that the pen register and trap and trace data for Subject Telephone Five indicated that Mark Williams had extensive contact with telephone numbers in several areas in the United States associated with international MDMA importers. *Id.* at ¶¶ 29–30. Coupled with DEA intelligence information, the Affidavit describes agents' belief that Mark Williams was potentially contacting national and international drug traffickers staying in hotels in such areas as New York and California. *Id.* at ¶ 30. The Affidavit further states that Subject Telephone Five was in contact with telephone numbers in areas recognized as major distribution areas in the United States such as Chicago, Hawaii, and Las Vegas. *Id.* The difficulty with using this information to assist the investigation, however, was also described in the Affidavit. Agents could not identify the individuals placing or receiving the telephone calls from pen register or trap-and-trace information and could only speculate as to the purpose of such calls. *Id.* at ¶ 56. Therefore, the Affidavit sufficiently explained that this traditional investigative technique was of limited usefulness and unlikely to succeed.

Based on my *de novo* review, I find that the Government provided a full and complete statement meeting § 2518(1)(c)'s requirements. I also find that Judge Weinshienk did not abuse her discretion in concluding under § 2518(3)(c) that the first wiretap was necessary.

**(vi.) SECOND EXTENSION OF THE FIRST WIRETAP, 01–WT–01–Z, APRIL 18, 2001.**

 On April 18, 2001, Judge Weinshienk entered an Order authorizing the continued interception of electronic communications on Subject Telephone One, John Sposit's cellular telephone. The application to extend communications describes how each of the traditional investigative techniques had been tried and failed, or was unlikely to succeed or too dangerous. *See* Affidavit for the Second Extension of First Wiretap, April 18, 2001 ("Aff. of Apr. 18, 2001"), at ¶¶ 29–56. The Affidavit details new developments in the investigation of the organization run by Sposit since the prior Applications, but it stated that these new developments did not affect the Government's need for a wiretap, and, if anything, supported the continuing need to intercept communications. *Id.* at ¶¶ 17–28, 46. For example, the Affidavit describes a meeting between CS–4 and Sposit on April 6, 2000, for which agents could not use surveillance because Sposit showed up at

CS–4's home unexpectedly. *Id.* at ¶ 46. Sposit informed CS–4 that he was considering using an MDMA source other than Nathan Kern, but he did not reveal any information about this source to CS–4. *Id.* Despite the use of traditional investigative techniques, agents were only able to deduce the identity of this alternative source based on prior intercepted communications. *Id.* Accordingly, I find that the Government complied with § 2518(1)(c) and find no abuse of discretion on behalf of Judge Weinshienk in ruling that this extension was necessary.

### (vii.) FIFTH WIRETAP: SUBJECT TELEPHONE SIX, 01–WT–11–Z, MAY 18, 2001.

One day after the wiretap on Subject Telephone Five expired, the Government applied to intercept communications over a different cellular telephone used by Mark Williams. The Affidavit describes how in early May 2001, the number of telephone calls intercepted on Subject Telephone Five decreased significantly. *See* Affidavit for the Fifth Wiretap, May 18, 2001 ("Aff. of May 18, 2001") at ¶ 18. Further, the Affidavit details the agents' belief that Mark Williams wanted to change his telephone number to avoid detection by law enforcement as he coordinated his drug trafficking activities. *Id.* at ¶ 43. Although the Tenth Circuit has determined that a target may not vitiate the necessity showing for a prior wiretap by simply changing his telephone number (*see Castillo–Garcia,* 117 F.3d at 1196), I have carefully reviewed this Application and Affidavit to determine if the Government paused to consider traditional investigative techniques in light of any evidence obtained from the wiretap on Subject Telephone Five before seeking to intercept communications on Subject Telephone Six.

■ The Application for Subject Telephone Six incorporated the Affidavit for Subject Telephone Five and details the information obtained during the first thirty days of that wiretap. As a result of the interceptions on that telephone, agents learned that Mark Williams had international ties to MDMA traffickers and, together with a newly identified drug trafficker, Jason Price, was operating at the highest level of MDMA distribution in Colorado. *See* Aff. of May 18, 2001, at ¶¶ 14, 72. Despite this newly acquired evidence, the Affidavit states that agents continued to attempt traditional investigative methods and had either failed completely, had limited success but failed to achieve the full objectives of the investigation, reasonably appeared unlikely to succeed, or were too dangerous to employ. *Id.* at ¶ 48.

The Affidavit provides the results of continued surveillance of Mark Williams and his associates. *Id.* at ¶¶ 25, 40, 49–54. Surveillance assisted agents in successfully seizing large quantities of MDMA (specifically, 26,000 MDMA pills during the interceptions on Subject Telephone Five). However, the Affidavit indicates that surveillance was only helpful when used in connection with information from intercepted communications. *Id.* at ¶ 49. In addition, the Affidavit describes another instance where Mark Williams and an associate detected surveillance. *Id.* at ¶ 51. Accordingly, the Government sufficiently demonstrated that surveillance alone was unable to conclusively establish the sources of the drugs and had even potentially jeopardized the investigation.

In addition to the information incorporated from the previous wiretap application, the Affidavit details unsuccessful efforts to interrogate and question witnesses or participants. *Id.* at ¶¶ 62–63. The Affidavit describes the agents' efforts to interrogate Daniel Chum after a search of his automobile that yielded 1,000 MDMA pills and $8,750 cash. *Id.* at ¶ 25. Chum in-

formed the agents that he had received 2,000 MDMA pills from "Mark" but would not provide any other information about "Mark" because he feared retribution for cooperating with the agents. *Id.* The Affidavit further provides that subsequent to Chum's interaction with the agents, communications were intercepted in which Mark Williams threatened to kill Chum and burn Chum's house down. *Id.* at ¶ 63.

The Affidavit also describes the agents' belief that the use of search warrants, cooperating sources, or undercover agents would not assist in this stage of the investigation. The Affidavit indicates that the known cooperating sources had exhausted their usefulness and that no new sources with information on or access to Mark Williams had been developed. *Id.* at ¶¶ 60–61. Similarly, the undercover agents assisting at the outset of the investigation did not have contact with Mark Williams, and no new information indicated that an undercover agent could be introduced to Mark Williams. *Id.* at ¶¶ 66–67. The Affidavit also explains that the use of search warrants would not achieve the objectives of the investigation for the same reasons identified in prior wiretaps. *Id.* at ¶¶ 55–59.

Finally, detailed information obtained through trap and trace devices and pen registers was included in the Affidavit. *Id.* at ¶ 46(a)-(k). This information led agents to suspect that Mark Williams had criminal connections and an MDMA supplier in New York. *Id.* at ¶ 69. However, this information benefitted the investigation only when used in tandem with intercepted communications. *Id.* Based on my *de novo* review, I find that the Government complied with § 2518(1)(c). I also find that Judge Weinshienk did not abuse her discretion in concluding under § 2518(3)(c) that the Fifth Wiretap was necessary.

**(viii.) SIXTH WIRETAP: SUBJECT TELEPHONE SEVEN, 01–WT–12–Z, MAY 24, 2001.**

 The target of this wiretap was Jason Price, whom agents identified during the interceptions of Subject Telephones Five and Six as a drug trafficker and MDMA source for Mark Williams. The Affidavit indicates that agents had little information about Jason Price or his drug trafficking activities. *See* Affidavit for the Sixth Wiretap, May 24, 2001 ("Aff. of May 24, 2001"), at ¶ 17. While the Defendants, particularly counsel for Jason Price, contend that the paucity of particularized factual information contained in the Affidavit is fatal to the Government's necessity showing for this wiretap, I find that this Affidavit, together with the Government's statements during the colloquy with Judge Weinshienk on May 24, 2001, is sufficient to satisfy the requirements of § 2518(1)(c).

The Affidavit provides a general statement that physical surveillance had been conducted on numerous occasions against "key members of the organization, including PRICE," but indicates that such surveillance had been only partially successful in identifying co-conspirators and detecting the receipt or distribution of shipments of MDMA. *See* Aff. of May 24, 2001, at ¶ 50. The only particularized statement regarding surveillance of Jason Price is set forth in ¶ 53 of the Affidavit and describes an instance where he detected surveillance. On May 16, 2001, an agent was parked in an empty parking lot attempting surveillance on Jason Price. *Id.* at ¶ 53. Jason Price parked his car so that it nearly touched the front of the agent's car. *Id.* After staring at the agent for a brief time, Jason Price exited the parking lot. *Id.* The following day, Jason Price contacted AT & T Wireless and changed his telephone number. *Id.* Therefore, the Affida-

vit does provide a particularized instance where surveillance had been tried and failed.

Further, the Affidavit indicates that agents could not use a pole camera to further their investigation. The Affidavit provides that agents did not even know the location of Jason Price's residence. *Id.* at ¶ 55. Although the Defendants contend that the Affidavit lacks any particularized information regarding agents' inability to locate Jason Price's home, the Government supplemented this information during the *in camera* hearing with Judge Weinshienk on May 24, 2001, as follows:

> THE COURT: Okay. So [Jason Price] apparently suspects that there is surveillance.
>
> SPECIAL AGENT ROACH: Yes. He suspects. And we have not even been able to figure out where he lives. We've tried to follow him. He drives like a maniac. And as indicated by the time when he saw surveillance and approached them, he's very surveillance conscious.

*See* Transcript ("Tr.") of May 24, 2001, pp. 3–4. It is clear from the particularized facts submitted to Judge Weinshienk in the Affidavit and at the *in camera* hearing that Jason Price was aware of the Government's surveillance attempts and that surveillance was unavailing due to his counter-surveillance techniques. Thus, I find that it is clear from the Government's recitation of the facts that this traditional investigative technique had proved unsuccessful in advancing the investigation and had threatened to expose or compromise the investigation.

The Affidavit also demonstrates that other traditional techniques had been tried and failed or were unlikely to succeed, or that it would be unreasonable to require the agents to attempt such techniques given the present posture of the investigation. As to search warrants, the Affidavit indicates that agents had executed search warrants on two locations associated with the investigation. *See* Aff. of May 24, 2001, at ¶ 58. Jason Price contends that this information is not relevant because it pertains to the "John Sposit" phase of the investigation and was not directed at Jason Price or his drug organization. I disagree. The Affidavit sufficiently details the agents' belief that John Sposit obtained his drugs from Mark Williams and that Mark Williams obtained his drugs, in part, from Jason Price. *Id.* at ¶¶ 13(b), 14. Despite this connection, the Affidavit reveals that executing search warrants at a storage location utilized by John Sposit and at the residence of John Sposit's distributors did not provide evidence of Jason Price's drug trafficking. *Id.* at ¶ 58. Together with the information concerning agents' inability to locate Jason Price's residence or the existence and location of his stash house, I find that the Government's statements regarding search warrants satisfied the requirements of § 2518(1)(c). *See id.* at ¶¶ 57–62; Tr. of May 24, 2001, p. 4.

As to cooperating sources and undercover agents, the Affidavit explains that there was none in contact with Jason Price. *See* Aff. of May 24, 2001, at ¶¶ 64, 70. The Affidavit specifically provides that there are "no sources available to provide *timely* information regarding Price's drug trafficking activities." *Id.* at ¶ 64 (emphasis added). To the point of histrionics, Defendants take issue with the Government's need for "timely" information, arguing that if the Government does not have " 'timely' information at the moment they first learn the identity of another target of the investigation, they simply throw up their hands and claim they need a wiretap of that individual's phone." Def. Price Mot., Jul. 1, 2002, pp. 54–55. I disagree with the Defendants' characterization of the Government's decision-making process for requesting a wiretap. As represented in the

Government's recitation of the facts of the case, the agents did not have a cooperating source or undercover agent in contact with Defendant Price, nor did they believe that one could be timely developed. Jason Price was acutely aware and suspicious of the Government's efforts at tracking his activities. Based on the facts contained in the Affidavit, I am unwilling to second-guess the agents' assessment of their ability to introduce an undercover agent or develop a new cooperating source with respect to Jason Price. The Affidavit sufficiently demonstrates that it would have been unreasonable to further pursue these traditional investigative techniques.

Information concerning agents' prior unsuccessful attempts to interview witnesses is also contained in the Affidavit. *See* Aff. of May 24, 2001, at ¶¶ 65–67. As agents had not identified any new witnesses for questioning, the Government sufficiently explained that the interrogation of witnesses had failed and, if pursued further, was unlikely to succeed. Moreover, the Affidavit demonstrated that pen register and trap and trace data had been used but did not reveal the information that investigators needed to further their objectives. *See id.* at ¶¶ 72–73.

Based on my *de novo* review, I find that the Government provided a full and complete statement meeting § 2518(1)(c)'s requirements. I also find that Judge Weinshienk did not abuse her discretion in concluding under § 2518(3)(c) that the Sixth Wiretap was necessary.

(ix.) **Seventh Wiretap: Subject Telephone Eight, 01–Wt–15–Z, June 4, 2001.**

 The Affidavit for Subject Telephone Eight sought to intercept communications on another telephone used by Mark Williams. The Affidavit indicates that agents only intercepted communications on the previous Mark Williams wiretap for two days, May 22 and 23, 2001, because it became clear to agents from the outset that Mark Williams was now using Subject Telephone Eight to coordinate his MDMA trafficking activities. *See* Affidavit for the Seventh Wiretap, June 4, 2001 ("Aff. of June 4, 2001"), at ¶¶ 19–25. The Affidavit describes the agents' belief that Mark Williams was extremely concerned about possible law enforcement detection of his criminal activities following the seizure of MDMA pills from Elijah Williams and Daniel Chum, believed to be Mark Williams's MDMA distributors. *Id.* at ¶¶ 13(r), (bb) and 25. Agents confirmed their suspicions through intercepted conversations between Mark Williams and his associates wherein they discussed obtaining new cellular telephones and their need to proceed cautiously in the future. *Id.* at ¶ 25.

Further, this Affidavit provides particularized factual information that Mark Williams was using Subject Telephone Eight to facilitate the activities that he had previously coordinated through the use of Subject Telephone Six. This Affidavit incorporates the Affidavit submitted with the Government's application for a wiretap on Subject Telephones Six and Five, for which I have already determined that the Government satisfied § 2518(1)(c). The Tenth Circuit has held that a target of a wiretap cannot defeat a prior necessity showing "simply by changing phone numbers." *Castillo–Garcia*, 117 F.3d at 1196. I also conclude from the Government's Affidavits that there were no intervening events between May 23, 2001, and June 4, 2001, to alter that conclusion.

Based on my *de novo* review, I find that the Government provided a full and complete statement meeting § 2518(1)(c)'s requirements. I also find that Judge Weinshienk did not abuse her discretion in

concluding under § 2518(3)(c) that the Seventh Wiretap was necessary.

### (x.) EIGHTH WIRETAP: SUBJECT TELEPHONE NINE, 01–WT–17–Z, JUNE 13, 2001.

 The Affidavit for the Subject Telephone Nine, another phone in Mark Williams's possession, indicated that agents encountered the same difficulties with Subject Telephone Eight as they had with Subject Telephone Six; Mark Williams was constantly changing cellular phones to "evade and thwart law enforcement authorities." *See* Affidavit for the Eighth Wiretap, June 13, 2001 ("Aff. of June 13, 2001"), at ¶ 19. The Affidavit outlines the ongoing efforts by subject Mark Williams to disrupt the investigation by changing his telephone number numerous times. *Id.* Specifically, the Affidavit states that Mark Williams had used four different cellular phones to conduct his drug trafficking activities since May 2001. *Id.* at ¶¶ 17–19. The Affidavit outlines information that implicates Subject Telephone Nine as being a phone to which other members of the organization have placed calls on various occasions, and it notes that these conversations have been intercepted under the authority of other wiretaps in this case. *Id.* at ¶¶ 20–27.

Moreover, the Affidavit incorporates by reference the prior Affidavits from Subject Telephones Five, Six and Eight. In each of these Affidavits, the Government makes a showing of necessity sufficient to authorize the interception of communications on these phones. No substantive changes have occurred in the investigation in the nine days since the issuance of the prior wiretap authorization to alter the necessity conclusion and I find nothing in the Government's current Affidavit that calls the necessity of this wiretap into question.

Therefore, based on my *de novo* review, I find that the Government provided a full and complete statement meeting § 2518(1)(c)'s requirements. I also find that Judge Weinshienk did not abuse her discretion in concluding under § 2518(3)(c) that the Eighth Wiretap was necessary.

### (xi.) NINTH WIRETAP: SUBJECT TELEPHONE TEN, 01–WT–18–Z, JUNE 26, 2001.

 The Affidavit states that surveillance has been attempted on Vladislav Radosavljevic and other key members of the organization. *See* Affidavit for the Ninth Wiretap, June 26, 2001 ("Aff. of June 26, 2001") at ¶¶ 30, 40, 60. It is clear from the Government's recitation of the facts that it was difficult for agents to conduct surveillance on Radosavljevic. *Id.* The Affidavit described an instance where Radosavljevic told Mark Williams he was calling from home, but pen register data indicated he was actually calling from a gas station. *Id.* at ¶¶ 43–44. The Affidavit also provides with particularity in ¶ 65 that the use of "pole cameras" or other mobile tracking devices would be of little use in conducting surveillance on Radosavljevic's house, because agents believed that Radosavljevic had connections to MDMA suppliers and arranged for others to receive and stash the drugs.

The Affidavit also provides the reasons why surveillance had only limited success. For example, the agents had obtained information that Radosavljevic was traveling to New York and Amsterdam. *Id.* at ¶¶ 15, 25, 29, 32, 38, 83. Agents had also obtained information that Radosavljevic used the Internet in New York to facilitate drug transactions. *Id.* at ¶¶ 28, 29, 32. These and other statements in the Affidavit support the conclusion that agents would be unlikely to achieve the investigation's objectives simply by conducting surveillance. Rather, the Affidavit indicates that Radosavljevic had more of a surrepti-

tious role in the organization that consists of making phone calls and possibly directing the transportation of drugs via the Internet. Any information learned about Radosavljevic which implicates him specifically in criminal dealings has been obtained through the interception of telephone calls on Mark Williams's phone.

The Affidavit states that interviews with known associates or witnesses would be unsuccessful in providing information regarding Radosavljevic's international sources. The Affidavit describes several occasions where associates had been interviewed or interrogated and states that these interviews had been unsuccessful. *See* Aff. of June 26, 2001, at ¶¶ 74–77. The Affidavit indicates that the use of a grand jury or the interrogation of high-level associates such as Radosavljevic would be likely to compromise the goal of the investigation.

The Affidavit gives two reasons why search warrants would be unsuccessful in this case: (1) previous search warrants executed on other members of the organization had revealed only limited quantities of MDMA (*id.* at ¶ 68); and (2) agents were likely to obtain similar results from executing search warrants for Radosavljevic, as they had no information that Radosavljevic was responsible for storing any MDMA (*id.* at ¶ 69).

As to the use of cooperating sources, the Affidavit indicates that this technique is unavailing because no sources exist with connections to Radosavljevic's international source. *Id.* at ¶ 72. The Affidavit contains information from a high-level corroborating source regarding associations between the MDMA sources in the Netherlands and MDMA traffic in the United States. *Id.* at ¶ 73. However, this informant did not have any information about Radosavljevic or other suspects in Colorado. *Id.* Given that an objective in this case is to identify Radosavljevic's possible international sources, I find that the Affidavit sets forth a sufficient explanation for why the use of cooperating sources at this stage would be unlikely to succeed.

The Affidavit states with particularity that pen registers and trap and trace devices had been used with some success. Agents used pen register activity to elicit information about Radosavljevic's possible New York source of supply. *Id.* at ¶ 83. The Affidavit also states that the information gained through the use of these devices was of little use without corroborating wiretap information. *Id.* at ¶¶ 82, 83. The Affidavit points out that, although general information was obtained through a pen register about Radosavljevic's possible New York supply source, the agents would have been unable to prove the actual nature of the relationship between Radosavljevic and his source without the interception of wire communications. *Id.* at ¶ 83.

Based on my *de novo* review, I find that the Government provided a full and complete statement meeting § 2518(1)(c)'s requirements. I also find that Judge Weinshienk did not abuse her discretion in concluding under § 2518(3)(c) that the Ninth Wiretap was necessary.

**(xii.). TENTH WIRETAP: SUBJECT TELEPHONE ELEVEN, 01–WT–19–Z, JULY 11, 2001.**

After agents became aware that Jason Price was no longer using Subject Telephone Seven, the Government submitted an Application and Affidavit for interceptions on his new cellular phone on July 11, 2001. *See* Affidavit for the Tenth Wiretap, July 11, 2001 ("Aff. of July 11, 2001"), at ¶ 58. The Affidavit, as well as the Government's statements during the *in camera* hearing with Judge Weinshienk, indicates that the agents had entered the "final

phase of the investigation." *See* Tr. of July 11, 2001, p. 4. Agents had successfully identified three major Ecstasy trafficking groups in Colorado: John Sposit's; Jason Price's; and one led by Mark Williams and Vladislav Radosavljevic. *Id.;* Aff. of July 11, 2001, at ¶ 16. Agents had identified "basically all of the distribution network for [the] three organizations" but argued that they needed a wiretap to obtain information about the MDMA suppliers for Jason Price, Mark Williams, and Vladislav Radosavljevic. Tr. of July 11, 2001, p. 4.

■ The Affidavit summarizes the most recent information obtained during the investigation of Jason Price, which reflects the need for a wiretap of this phone. *See* Aff. of July 11, 2001, at ¶¶ 42–50. The Affidavit indicates that Jason Price continued to be extremely vigilant about the presence of law enforcement. He informed his associates that he was being followed by police and drastically reduced his use of Subject Telephone Seven after he detected surveillance on June 12, 2001. *Id.* at ¶ 58. Despite these counter-surveillance measures, agents continued to conduct surveillance on Jason Price and his associates. *Id.* at ¶ 50. The Affidavit describes agents' repeated unsuccessful attempts to observe a drug transaction among Jason Price, Edward Gleason and Steve Gleason involving $100,000 worth of MDMA. *Id.* However, despite their continued use of this traditional investigative technique in conjunction with intercepted telephone calls, agents were unable to determine whether the deal was completed. *Id.*

The Affidavit also describes the Government's continued belief that cooperating sources, witness interviews, search warrants, and undercover agents would not further the investigation's goal of identifying Jason Price's MDMA source. The agents still did not have any cooperating sources or undercover agents in contact with Jason Price, and there were no newly identified witnesses who could be safely approached for questioning. *Id.* at ¶¶ 68–77. Further, the pen register and trap and trace data was of limited use, and the Affidavit indicated that the data did not reveal the information that investigators needed to satisfy the investigation's objectives. *Id.* at ¶¶ 78–79. Thus, due to Jason Price's counter-surveillance measures and these other circumstances, continued use of traditional investigative techniques carried a serious risk of jeopardizing the investigation.

Based on my *de novo* review, I find that the Government provided a full and complete statement meeting § 2518(1)(c)'s requirements. I also find that Judge Weinshienk did not abuse her discretion in concluding under § 2518(3)(c) that the extension of the Tenth Wiretap was necessary.

### (xiii.) EXTENSION OF EIGHTH WIRETAP, 01–WT–17–Z, JULY 12, 2001.

■ The Affidavit at issue gives detailed regarding information obtained during the interceptions of the Eighth Wiretap, 01–WT–17–Z, dated June 13, 2001. *See* Affidavit for the Extension of the Eighth Wiretap, July 12, 2001 ("Aff. of July 12, 2001"). The Affidavit outlines agents' attempts in conducting surveillance against Mark Williams and his associates, including one instance where he detected such surveillance. *Id.* at ¶¶ 37–41. On June 18, 2001, agents were conducting surveillance on Mark Williams when they intercepted communications from his cellular telephone indicating that he had detected the surveillance. *Id.* at ¶ 42. Mark Williams eventually abandoned his car and proceeded on foot until an associate provided him with alternative transportation. *Id.*

Although the agents had successfully interviewed witnesses in the past (*id.* at ¶¶ 54–58), the Affidavit does not describe any new information suggesting that this technique was likely to be successful at the present time. Similarly, no new information altered the prior conclusion that search warrants could not be used successfully. *Id.* at ¶¶ 20–34. Moreover, the interceptions since June 13, 2001, support the Affiant's prior conclusion that informants could not be used successfully due to the evasive and exclusive nature of Mark Williams's dealings. *Id.* Finally, the Affidavit sufficiently explains that pen registers, trap-and-trace, and toll information was subject to similar limitations as outlined in the previous Affidavit and would not advance the investigation. *Id.* at ¶¶ 61, 62.

Based on my *de novo* review, I find that the Government provided a "full and complete statement" meeting § 2518(1)(c)'s requirements. I also find that Judge Weinshienk did not abuse her discretion in concluding under § 2518(3)(c) that the extension of the Eighth Wiretap was necessary.

(xiv.) ELEVENTH WIRETAP: SUBJECT TELEPHONE TWELVE, 01–WT–21–Z, JULY 18, 2001.

■ On July 18, 2001, the Government sought a wiretap for yet another telephone recently obtained by Mark Williams. This Affidavit and Application, which were filed only six days after the commencement of an extension wiretap for Mark Williams, indicates that most of his distribution network had been identified and that this wiretap was necessary to prevent the successful delivery and distribution of the MDMA that agents anticipated that Mark Williams would receive from Radosavljevic's suppliers in the New York area and the Netherlands. *See* Affidavit for the Eleventh Wiretap, July 18, 2001, ("Aff. of July 18, 2001"), at ¶ 20. No new information had been received in the preceding six days that would negate the prior necessity finding for a new phone used by Mark Williams. According to the Affidavit, investigative techniques other than electronic surveillance continued to be futile for several reasons: Mark Williams was very suspicious of potential surveillance and had detected agents' efforts in the past (*id.* at ¶ 32); the agents did not have any cooperating sources or undercover agents who had access or knowledge of the individual(s) supplying Mark Williams with MDMA (*id.* at ¶¶ 42–43, 49–50); and witness interviews, search warrants, and pen register/trap and trace devices were subject to the same limitations identified in previous wiretaps (*id.* at ¶¶ 36–41, 44–48, 51–52). Given the status of the investigation and the type of information sought by this wiretap, I conclude based on my *de novo* review that the Government provided a full and complete statement meeting § 2518(1)(c)'s requirements. I also find that Judge Weinshienk did not abuse her discretion in concluding under § 2518(3)(c) that this wiretap was necessary.

(xv.) EXTENSION OF NINTH WIRETAP, 01–WT–18–Z, JULY 25, 2001.

■ The Affidavit filed in support of the extension for the Ninth Wiretap indicates that the information obtained since the commencement of that wiretap had not altered the need for interceptions. Analysis of intercepted calls demonstrated that Radosavljevic was attempting to coordinate an international shipment of MDMA and that he was in frequent contact with MDMA traffickers in New York and Europe. *See* Affidavit for the Extension of Ninth Wiretap, July 25, 2001 ("Aff. of July 25, 2001"), at ¶¶ 20–35. Intercepted communications and analysis of calling records led agents to believe that Djole LNU was Radosavljevic's European MDMA source. *Id.* at ¶ 32. The Affidavit indicated that

traditional investigative techniques provided little assistance in obtaining information about this supplier and that only a wiretap would allow agents to meet the objectives of the investigation. However, the intercepted conversations indicated that even a wiretap may not assist the investigation, as Radosavljevic was extremely reluctant to discuss drug transactions on the telephone due to his fear that law enforcement was monitoring his activities. *Id.* at ¶¶ 29–30.

In addition, the agents still did not have any witnesses or undercover agents with information about Radosavljevic's New York or European contacts. And as to the corroborating source discussed in the Affidavit for the Ninth Wiretap, this Affidavit states that he/she continued to be of no use to this particular investigation. *Id.* at ¶¶ 53–62. The Affidavit also indicates that agents had collected trash placed in front of Radosavljevic's residence, but nothing was obtained which aided agents in identifying a source of MDMA. *Id.* at ¶ 65. Finally, the Affidavit indicated that the pen register/trap and trace data had assisted agents in identifying Djole LNU as a possible source, but without intercepted telephone calls, this technique would not reveal the type of information the agents needed to satisfy the investigation's objectives. *Id.* at ¶¶ 32, 63–64.

Based on my *de novo* review of the information submitted to Judge Weinshienk for the extension of the Ninth Wiretap, I find that a full and complete statement was submitted in compliance with § 2518(1)(c). I also find that Judge Weinshienk did not abuse her discretion in concluding that this extension was necessary pursuant to § 2518(3)(c).

(xvi.) Twelfth Wiretap: Subject Telephone Thirteen, 01–Wt–22–Z, August 16, 2001.

▮ On August 16, 2001, the Government sought permission to intercept the communications of Juan Ceja–Ponce, constituting the final wiretap used in this investigation. The Affidavit states that agents had intercepted phone calls over Mark Williams's telephone indicating that Ceja–Ponce supplied MDMA to Mark Williams, distributed MDMA and cocaine, and that Ceja–Ponce's supplier may reside in California. *See* Affidavit for the Twelfth Wiretap, August 16, 2001 ("Aff. of Aug. 16, 2001"), at ¶ 13(a). By intercepting Ceja–Ponce's communications, agents hoped to identify and dismantle his MDMA trafficking organization and confirm their belief that groups who traditionally trafficked in cocaine were entering the MDMA trafficking trade. *Id.* at ¶ 16.

The Affidavit describes the difficulty the agents experienced in conducting surveillance on Ceja–Ponce. *Id.* at ¶ 52. The Affidavit indicates that agents did not even know where Ceja–Ponce lived, resulting in their conducting surveillance when intercepted communications indicated that he could be found at a specific location. *Id.* The Affidavit describes an instance where agents conducted surveillance on Ceja–Ponce and Mark Williams. When Ceja–Ponce left Mark Williams's home, he was stopped by police officers for a traffic violation. *Id.* at ¶ 23. Ceja–Ponce was arrested because he was unable to provide license or registration, though he did give his name and home address. *Id.* It was only after his release that agents learned that Ceja–Ponce provided them with the address of a shopping center rather than his home. *Id.* The Affidavit also describes attempted surveillance of a meeting between Ceja–Ponce and Mark Williams. *Id.* at ¶¶ 29–30. However, Mark Williams detected the surveillance, causing agents to terminate their efforts. *Id.* at ¶¶ 29–30, 52.

The Affidavit provides that the dearth of information concerning Ceja–Ponce pre-

cluded the effective use of a search warrant. *Id.* at ¶¶ 57–58. Agents had identified two residences where Ceja–Ponce had been seen, but agents did not know where he lived, let alone if, or where, he stored MDMA. *Id.* at ¶¶ 52, 57–58. Similarly, the Affidavit provides that cooperating sources and undercover agents would not be successful in furthering the investigation of Ceja–Ponce. There were no cooperating sources possessing information about Ceja–Ponce, nor were there any undercover agents in contact with him. *Id.* at ¶¶ 61, 65. Further, the Affiant suggested that introducing an undercover agent to Ceja–Ponce was unlikely to succeed because "major drug traffickers rarely conduct business with anyone not well known to them." *Id.* at ¶ 66.

Witness interviews, the grand jury, and pen register/trap and trace devices either were also tried and failed or were unlikely to succeed as outlined in the Affidavit. For example, the analysis of toll data coupled with intercepted communications on Mark Williams's phone led agents to suspect that Ceja–Ponce had a drug source in California. *Id.* at ¶ 68. However, the toll analysis alone could not reveal the identities of the persons in California making or receiving phone calls or the contents or purposes of the conversations.

Under the Government's recitation of the facts, it is clear to me that the Twelfth Wiretap was necessary and that it would have been unreasonable to further pursue traditional investigative techniques. The Affidavit also describes the traditional investigative techniques that had been unsuccessful and sufficiently explains why any untried technique would be similarly unsuccessful. Based on my *de novo* review of the information before Judge Weinshienk, I am satisfied that the Government provided a full and complete statement meeting § 2518(1)(c)'s requirements. I also find that Judge Weinshienk did not abuse her discretion in concluding under § 2518(3)(c) that this wiretap was necessary.

## IV. SUBFACIAL CHALLENGES TO THE AFFIDAVITS UNDER *FRANKS V. DELAWARE*

 The Defendants also allege that the Affidavits submitted in support of the wiretaps contained material misstatements or omissions of fact that vitiate the necessity findings for the wiretaps in this case. As discussed above, the Defendants did not make a substantial preliminary showing that the Government, either intentionally, knowingly, or with a reckless disregard for the truth, included false statements in, or omitted material information from, the wiretap affidavits.[10] *Oregon–Cortez*, 244 F.Supp.2d at 1171 n. 4; *Small*, 229 F.Supp.2d at 1189–90. As such, an evidentiary hearing on necessity-related issues should not have taken place. However, as set forth below, even if I consider the evidence adduced at the April 30, May 1, 29, and 30, 2002, hearings, it does not alter my conclusion that the Defendants failed to satisfy their burden under *Franks*. I further find that the information and evidence presented at

---

**10.** I described the remaining aspects of the *Franks* framework in *Small* as:

> if a Defendant establishes by a preponderance of the evidence that the omissions or misstatements were made intentionally or with a reckless disregard for the truth, a reviewing court must engage in a "critical final step" to actually effect the suppression of evidence. *United States v. Ozar*, 50 F.3d 1440, 1446 (8th Cir.1995). The reviewing

court must formally weigh whether the wiretap application, "corrected for any false statements and omissions, is sufficient to show probable cause" or necessity. *Id.; accord, Green,* 175 F.3d at 828.

*Small*, 229 F.Supp.2d at 1190. The Defendants here did not make a showing by a preponderance of the evidence, and any such corrections would have bolstered the necessity for these wiretaps.

the hearings does not vitiate the necessity finding.

With respect to the Affidavit filed in support of the First Wiretap, the Defendants claim that the Government misrepresented the true reason their agents were no longer able to purchase MDMA directly from Defendant Sposit. They contend that the Government's explanation—because Sposit did not trust Special Agent Jennifer Cotter—is not worthy of belief. Rather, Defendants claim that the true reason Sposit ended his personal transactions with the undercover agent was due to the Government's "inexplicable" decision to "downscale" the amount of drugs they were purchasing from him. *See* Def. Sposit Mot., June 28, 2002, ¶ 9. By implication, it appears that the Defendants are accusing the Government of sabotaging their own ability to purchase MDMA in an effort to bolster their need for a wiretap.

Defendants' hypothetical, unsubstantiated allegations would not even entitle them to a hearing under *Franks* and certainly do not vitiate the necessity finding for the First Wiretap. Defendants failed to elicit any testimony from Agent Roach to support their allegations, nor did they provide an affidavit, sworn statement, or a "motion which contains otherwise verified information." *Franks,* 438 U.S. at 171, 98 S.Ct. 2674. Rather, the uncontroverted evidence, detailed in the Affidavit and elicited at the hearings, provides that Defendant Sposit was suspicious of Agent Cotter and decided to refer her and TFO McElderry to one of his subordinates to conduct future MDMA transactions. *See* Tr. of May 1, 2002, p. 361; *see* Aff. of Feb. 14, 2001, at ¶¶ 37, 96.

Further, to the extent that Defendants Sposit and Medina–Garcia argue that the undercover agents should have handled their transactions with Defendant Sposit differently, *i.e.,* incrementally increasing the quantity of MDMA purchased, I find these type of allegations immaterial to a necessity finding. The following analysis from *Small* is instructive here:

> [d]efendants' allegations of what investigating agents *might* have done or *could* have done during the investigation is not material to a necessity finding. After the fact suggestions as to how the Government should have handled its investigation do not invalidate Judge Weinshienk's necessity finding. This type of *post hoc* rationalizing by the Defendants is entitled to little weight in the analysis of statutory compliance with § 2518(1)(c) and would clearly not vitiate the necessity finding in this case. [*United States v. Carrillo,* 123 F.Supp.2d 1223, 1245 (D.Col.2000); *see Crumpton,* 54 F.Supp.2d at 1008–09].

*Small,* 229 F.Supp.2d at 1195 (emphasis in original). The Affidavit accurately reflects that the undercover agents could no longer purchase MDMA directly from Defendant Sposit. The suggestion that the Government could have continued their relationship with Defendant Sposit if the MDMA purchases had been handled differently does not alter the accuracy of the information contained in the Affidavit. Here, I am only concerned with the truth of the allegations in the Affidavit, and, based on the foregoing, the Defendants have not demonstrated that Agent Roach intentionally or recklessly included any material false statements in the Affidavit for the First Wiretap concerning Agent Cotter or TFO McElderry.

Defendant Sposit also claims that the Government omitted information from the First Wiretap Affidavit regarding the decision to "arbitrarily" terminate the monitoring of phone calls between 11:00 p.m. and 8:00 a.m. *See* Def. Sposit Mot., June 28, 2002, ¶ 11. The Defendant appears to be arguing that the Government was required to inform Judge Weinshienk of its decision

to intercept calls fewer than 24 hours a day. However, the Defendant has not cited, nor am I aware of, any authority which required the Government to inform Judge Weinshienk of this fact. Agent Roach testified that generally calls between 1 a.m. and 8 a.m. were not intercepted or recorded because a "monitor was [not] present." Tr. of May 29, 2002, p. 576. I find nothing irregular about the Government's conduct here and conclude that even if I added this alleged omission to the Affidavit, the necessity for the First Wiretap would still exist.

As to the Affidavit filed in support of the first extension of the First Wiretap, Defendant Sposit contends that it contains material misrepresentations and omissions concerning CS–4. He claims that the Affidavit "did not fully detail [CS–4's] arrest and cooperation, nor did it indicate [CS–4's] value as a cooperating individual." *See* Def. Sposit Mot., June 28, 2002, ¶ 26. Defendant Sposit, however, does not articulate the deficiencies in the Affidavit with respect to the details of CS–4's arrest. The Affidavit provides that CS–4 was arrested in Nevada with 28 pounds of marijuana. *See* Aff. of Mar. 20, 2001, at ¶ 68. Further, the Affidavit indicates that CS–4 and Sposit pooled their money to purchase the marijuana from Nathan Kern. *Id.* The Affidavit describes how CS–4 was arrested when he attempted to transport the marijuana from California to Colorado. *Id.* Although it is not clear from Defendant Sposit's submission what additional information should have been included, I find that the circumstances surrounding CS–4's arrest were sufficiently detailed in this Affidavit.

Next, as to the CS–4's ability to benefit the investigation, Defendant Sposit takes issue with the alleged paucity of information in the Affidavit concerning CS–4's cooperation. My review of the Affidavit and the testimony of Agent Roach and Agent Stacy Slater does not support Defendant Sposit's argument. The Affidavit states that CS–4 was arrested on March 16, 2001, and Agent Slater testified that he interviewed CS–4 on March 17 and 20, 2001. Tr. of May 30, 2002, pp. 697, 700. Agent Slater also testified that at the time the Affidavit was submitted on the morning of March 20, 2001, he doubted whether CS–4 could be used as a confidential informant, because CS–4 provided certain false information to the agents during the first interview on March 17. *Id.* at 700. It was not until the second interview on the afternoon of March 20, after Judge Weinshienk granted the wiretap authorization, that CS–4 "came clean" and corrected the misleading information. *Id.* at 700–01. Agent Slater testified that the decision to use CS–4 as a confidential informant did not occur until after the second interview. *Id.* at 701.

Based on the foregoing, it is clear to me that the Government accurately portrayed CS–4's cooperation at the time the Affidavit was submitted to Judge Weinshienk. The Affidavit succinctly summarizes the information CS–4 provided regarding Sposit's drug trafficking and explains why the agents concluded that the investigation's objectives were not likely to be met through the use of CS–4. *See* Aff. of Mar. 20, 2001, at ¶ 68. The Government was only required to show why this unattempted investigative technique reasonably appeared unlikely to succeed. *Ramirez–Encarnacion,* 291 F.3d at 1222, n. 2. Given CS–4's credibility issues at the time the Affidavit was submitted and his limited knowledge of Sposit's MDMA business, I find that the Government sufficiently made that showing. Accordingly, I find that the Defendants have failed to satisfy their burden under *Franks* by a preponderance of the evidence.

As to the Affidavit submitted in support of the Fourth Wiretap, 01–WT–09–Z, Defendant Price argues that there are multiple material omissions and misstatements that vitiate the necessity finding. First, Defendant Price claims that the Government's failure to "provide particularized information regarding reasonable efforts to conduct physical surveillance of Williams and his drug organization other than the one instance described in paragraph 37 [sic] is a material omission." See Def. Price Mot., July 1, 2002, p. 39. The Government's Affidavit, however, describes how Mark Williams and an associate engaged in counter-surveillance techniques twice in one night. See Aff. of Apr. 13, 2001, at ¶¶ 25–26, 36. It is certainly clear from the Affidavit, even from this paragraph alone, that conducting surveillance on Mark Williams was difficult, had been tried and had failed, and was unlikely to be successful if pursued further. Moreover, even if I were to assume that this omission was material to the necessity finding, and engage in the final step of my *Franks* analysis by correcting the Affidavit for this omission, it would result in the Affidavit's containing more instances of surveillance on Mark Williams, which would clearly bolster the necessity finding in this case. Agent Roach testified that he did not include every single aspect of the investigation in this wiretap and in fact left out specific instances when surveillance was conducted against, and detected by, Mark Williams. See, e.g., Tr. of May 29, 2002, p. 533.

Defendant Price also claims that the Affidavit suffers from similar material omissions as to the Government's efforts to use search warrants directed at Mark Williams. Def. Price Mot., July 1, 2002, p. 40. Specifically, he claims that the Affidavit lacks any information, particularized as to Mark Williams, "regarding any attempts by law enforcement officers to employ the traditional investigative techniques [sic] of search warrants[.]" *Id.* Again, Defendant Price has misconstrued the law as it relates to the necessity requirement. The Government was never required to *attempt* to use a search warrant or any other traditional investigative technique. Rather, it is well-settled that if any traditional investigative technique has not been tried, the Government must *explain* why each such unattempted technique would be either unsuccessful or too dangerous. *Ramirez–Encarnacion*, 291 F.3d at 1222, n. 2. And even if the Government fails to explicitly *explain* why it did not attempt a traditional investigative technique, it is still not fatal to a wiretap application if "it is clear, under the government's recitation of the facts of the case, that requiring the government to attempt the unexhausted and unexplained normal investigative techniques would be unreasonable." *Garcia*, 232 F.3d at 1313 (quotations omitted).

Here, the Affidavit explains that agents did not know where Mark Williams stored his drugs (see Aff. of Apr. 13, 2001, at ¶ 42) and that executing a search warrant might have a deleterious effect on the investigation (*id.* at ¶ 43). *See also United States v. Torres*, 908 F.2d 1417, 1422 (9th Cir.1990) (upholding necessity finding in part because "the use of a search warrant or grand jury proceeding would alert appellants of an ongoing investigation"). Accordingly, and as set forth *supra*, the Affidavit sufficiently *explained* why this traditional investigative technique was unlikely to be successful in meeting the investigations' objectives, and the Government's recitation of the facts demonstrated that it would have been unreasonable to require the Government to attempt this technique.

As with the prior arguments, Defendant Price also claims that the Government's failure to provide particularized informa-

tion about its efforts to use cooperating sources—other than the one cooperating source described in the Affidavit—was a material omission. However, the Affidavit clearly provides that CS–5 was the only cooperating source at the Government's disposal with any knowledge of Mark Williams's MDMA trafficking activities. *See* Aff. of Apr. 13, 2001, at ¶ 48. The Affidavit further describes, with particularity, the Government's rationale for not instructing CS–5 to purchase MDMA from Mark Williams. *Id.* at ¶ 47. The testimony elicited at the hearings further explained the Government's decision and has no effect on the necessity finding. *See* Tr. of May 29, 2002, p. 497.

Finally, several Defendants argue that the Government "failed to conduct any investigation of Mark Williams before applying for the wiretap" because they sought a wiretap within three weeks of identifying him. *See, e.g.,* Defs. Rector and Graham Mot., July 1, 2002, at p. 14. Given the Affidavit's claims to the contrary, the Defendants contend that the Government completely misrepresented the extent of their pre-wiretap investigation of Mark Williams. However, the fact that the Government sought a wiretap against Mark Williams only weeks after agents became aware of his identity does not, without more, vitiate a necessity finding. Thus, however convenient it might be to resort to a bright-line rule for determining the minimum span of a pre-wiretap investigation, no such test—either a rule that three weeks is too short, as the Defendants contend, or a rule that three weeks is sufficient, as the Government might posit—has been adopted by any court. Rather, irrespective of the timeframe involved, the test is whether the Government attempted traditional investigatory techniques and failed, described with sufficient particularity why any untried technique would be unsuccessful or too dangerous, or clearly demonstrated in its recitation of the facts

that requiring the attempt of such techniques would be unreasonable. Here the Government satisfied that test with respect to the Affidavit submitted in support of the Fourth Wiretap, and the Defendants' *Franks* challenges failed to alter that conclusion.

As to the Affidavit submitted in connection with the Second Extension of the First Wiretap on April 18, 2001, the Defendants contend that material misrepresentations and omissions vitiate the necessity finding for this wiretap too. First, Defendant Edmonds contends that the necessity for wiretapping Defendant Sposit's telephone "completely waned" in the early part of April 2001 as the investigation's focus turned to Mark Williams, Jason Price and Nathan Kern. *See* Def. Edmonds Mot., May 20, 2002, ¶ 5. Defendant Edmonds claims that the Government misrepresented the continuing need for interceptions throughout this Affidavit. I disagree with the Defendant's contentions. Although the Government may have known the identities of John Sposit's coconspirators and a source for MDMA at the time it applied for this extension, it does not necessarily follow that the statements in the Affidavit regarding the necessity of the wiretap were false. For example, the agents were aware that John Sposit was considering using a new MDMA source other than Nathan Kern, but the agents did not know the new source's identity. *See* Aff. of Apr. 18, 2001, at ¶ 46. One of the Government's stated goals was to disclose the identity of the individuals supplying the named interceptees with controlled substances. *Id.* at ¶ 12(b). Therefore, the Government's knowledge of the identities of some suppliers does not preclude the Government from seeking an extension of the wiretap to pursue other investigative goals, particularly unidentified suppliers.

In addition, Defendant Sposit claims that the Government omitted information from the Affidavit for the Second Extension of the First Wiretap concerning an incriminating videotape of CS–4 and Sposit. The video was allegedly orchestrated by the Government to record a conversation between Sposit and CS–4 at CS–4's home. *See* Def. Sposit. Mot., June 28, 2002, at ¶¶ 20–23. Even if I were to assume that the Defendant made a substantial showing here, this information is not material, because its inclusion would have no effect on the necessity finding as the following testimony from the wiretap hearing clearly demonstrates:

> DEFENSE COUNSEL: My question, I think, is a little more specific. Is there any reason, specific reason you would have for not including what would seemingly, at least to many of us here, I would think, seemingly be a rather remarkable investigative break-through in an affidavit in support of an application for a second extension, a second extension of an original wiretap?
>
> AGENT ROACH: Yes. 'Cause it wasn't a rather remarkable investigative break-through. He didn't tell us anything we didn't know. If he had identified his sources or identified any of the things meeting the objectives, I would agree with you, it would be something that would be included. He didn't do such.'

Tr. of May 29, 2002, p. 557. Thus, the uncontroverted evidence on the record is that the contents of the videotape merely supplemented pre-existing evidence and confirmed agents' prior beliefs. The Defense did not contradict this evidence—through affidavits, by introducing the videotape itself, or otherwise—at the hearing and rested on the oral arguments made by counsel. Therefore, omitting this evidence had no effect whatsoever on my, or Judge Weinshienk's, necessity findings.

Next, the Defendants contend that the Affidavit submitted in connection with the Sixth Wiretap (Jason Price) also contains material misrepresentations and omissions. Similar to the *Franks* challenges with the Fourth Wiretap, the Defendants contend that the Government's failure to provide particularized information regarding reasonable efforts to use traditional investigatory techniques against Jason Price was a material omission. Further, to the extent that the Affidavit describes the agents' belief that these techniques were unavailing, the Defendants claim that these statements are misrepresentations. These arguments, however, are nothing more than the Defendants' previous necessity arguments, which were rejected *supra* and reframed as *Franks* challenges. I have already determined based on my *de novo* review of the Affidavit and the information presented during the *in camera* hearing before Judge Weinshienk that the Government did provide sufficient particularized information and that the Affidavit accurately describes the agents' beliefs concerning traditional investigatory techniques.

Furthermore, the testimony at the hearings in this case indicated that agents performed a more complete pre-wiretap investigation on Defendant Price than is described in the Affidavit. Agent Roach testified that an intelligence analyst, Wendi Roewer, checked several databases, including public service records and property records, before the Government sought to intercept Jason Price's telephone calls. *See* Tr. of May 29, 2002, pp. 463–64, 468. In addition, while commenting on the difficulty in conducting traditional investigative techniques with respect to Jason Price, Agent Roach testified that:

> [t]he first thing we tried to do was find him. He did have his cellular phone in his own name. It was subscribed as Jason Price. The address

came back to an address where we, despite frequent attempts to locate him there, he was never there. And my suspicion and belief was that he didn't live there. So we had a difficult time finding him that way.

\* \* \* \* \* \*

... we—frankly, we didn't know a whole lot about him. We knew his name, knew the phone he was using. Didn't know where he live [sic], didn't know his associates, didn't know of any of those kinds kind [sic] of things that would lead to normal investigative techniques. We tried to find him, were not very successful in doing so. We spoke to informants who we had. None of them were aware of his activities, and therefore it appeared reasonable that the only likely way to infiltrate his organization was through the use of a Title 3 [sic].

Tr. of Apr. 30, 2002, pp. 163–64. Focusing on the information known at the time the Government applied for this wiretap, the Defendants have not shown that the Government intentionally, knowingly, or recklessly misrepresented or omitted any information material to the necessity finding. Thus, Defendants' arguments must fail.

The Defendants' remaining *Franks* challenges concern the Affidavit submitted in support of the Twelfth Wiretap (Juan Ceja–Ponce). *See, e.g.*, Def. Ceja–Ponce Mot., May 20 and June 27, 2002. The Defendants claim that Agent Roach misrepresented agents' investigative efforts when he stated in the Affidavit that there had been some difficulty conducting surveillance on Ceja–Ponce was difficult and that agents did not even know where he lived. *See* Aff. of Aug. 25, 2001, at ¶ 52. The Defendants claim that agents failed to conduct any normal investigative techniques that should have been obvious to law enforcement when Ceja–Ponce was arrested during a traffic stop after he left

Mark Williams's residence on July 11, 2001. The Defendants argue that agents should have traveled to the Aurora jail to interview him or to conduct surveillance on him when he left police custody. They further claim that agents failed to pursue normal investigation leads such as checking records of telephone companies, public service companies, and local police departments. Finally, the Defendants argue that the Affidavit omitted, with a reckless disregard for the truth, the fact that surveillance had been conducted at an address associated with Ceja–Ponce on August 9, 2001.

As to these alleged misrepresentations and omissions, I find the Affidavit accurately reflects the Government's knowledge of Ceja–Ponce's residence. The Affidavit provides that "Agents have identified two residences where [ceja-ponce] has been seen and may stay on occasion, but it is not known where he regularly resides." Aff. of Aug. 25, 2001, at ¶ 52. The evidence offered by the Defendants does not contradict that statement. The exhibit referred to by the Defendants provides that agents observed Ceja–Ponce at two different locations on August 9, 2001. *See* Ex. 28, introduced at June 25, 2002, hearing. This evidence merely confirms what is contained in the Affidavit and certainly does not support a finding that Agent Roach intended to omit facts or mislead Judge Weinshienk.

Moreover, the remaining allegations of misrepresentations are more aptly described as what the agents should have or could have done with respect to their investigation of Ceja–Ponce. But as I stated previously, the Government's recitation of the facts clearly demonstrates that this wiretap was necessary under the circumstances. The necessity requirement is not an exhaustion requirement, and the Defendants' arguments to the contrary are insuf-

ficient to support a *Franks* challenge. *Castillo–Garcia*, 117 F.3d at 1187. These alleged misrepresentations do not negate the necessity finding.

### V. FAILURE TO SEEK TIMELY EXTENSION OF THE FIRST WIRETAP

Judge Weinshienk signed the Order for the First Wiretap on February 14, 2001, and, by its terms, that Order expired on March 16, 2001. The extension Affidavit and Application were presented to and signed by Judge Weinshienk on March 20, 2001. Defendant Sposit claims that any interceptions acquired as a consequence of the extension signed March 20, 2001 (First Extension of the First Wiretap) must be suppressed, as well as any evidence derived therefrom, because the previous Order had expired before the extension was granted. *See* Def. Sposit Mot., June 28, 2002, at ¶¶ 31–33.

Defendant Sposit did not cite any case law in support of his argument. Instead he relied on the following language of § 2518(5):

> [e]xtensions of an order may be granted, but only upon application for an extension made in accordance with subsection (1) of this section and the court making the findings required by subsection (3) of this section.

18 U.S.C. § 2518(5). Moreover, without any analysis, Defendant Sposit claims that:

> Subsection (5) must necessarily be interpreted to mean that an extension can be ordered only if a previous Order has *not* expired. No other interpretation is warranted from a reading of Subsection (5) and the entire text of Title III.

Def. Sposit. Mot., June 28, 2002, at ¶ 32.

■■■ Absent legal precedent to support the argument, I do not agree that Sposit's interpretation of Subsection (5) is proper. Courts from numerous jurisdictions, including a district judge from this District, have reached a different conclusion.

These decisions unanimously hold that a four-day "gap" between the expiration of a wiretap order and the date that the extension is granted is legally insignificant. *United States v. Carson*, 969 F.2d 1480, 1489–90 (3rd Cir.1992) (10 days); *see United States v. Nersesian*, 824 F.2d 1294, 1305–06 (2nd Cir.1987) (4 days); *see also United States v. Belcastro*, No. 84–CR–290, 1985 WL 4034, at *4 (D.Colo.1985).

Moreover, the specific facts of this case demonstrate that the gap in interceptions between the First Wiretap and its extension does not warrant suppression of any evidence here. Agent Roach testified that agents did not intercept a single telephone call between the expiration of the First Wiretap and the commencement of the extension wiretap. *See* Tr. of Apr. 30, 2002, p. 35. In addition, he testified that the gap in interceptions resulted from the unavailability of certain Judges of this District to approve the Order. *See* Tr. of May 29, 2002, pp. 563–64. Because the Judge who approves the wiretap Order is necessarily excluded from hearing the criminal case filed in connection with that wiretap, Agent Roach stated that it was the Government's preference to obtain approval from either Judge Weinshienk or Judge Kane. *Id.* Neither Judge Weinshienk nor Judge Kane was available during this gap period, and, rather than obtaining approval from a different Judge who would be excluded from hearing the case, the Government decided to wait until Judge Weinshienk was available on March 20, 2001. Thus, having determined that no telephone calls were intercepted during the gap period and that the delay in seeking the extension did not result from the Government's neglect, I find that the four-day delay in obtaining approval of the Extension of the First Wiretap does not warrant suppression as urged by Defendant Sposit.

## VI. Missing Ten-Day Report

The Defendants contend that the Government's inability to locate and provide to defense counsel a copy of the Eighth Ten-Day Report submitted for 01–WT–01–Z warrants suppression of certain evidence. The Government admits that it is unable to locate this report and concedes that it was not properly filed. *See* Govt. Mot. June 4, 2002; Tr. of May 29, 2002, p. 493. The Government, however, relies on the express language of Title III and vehemently contends that suppression is not warranted for its excusable neglect.

Title 18, U.S.C. § 2518(6) states, in pertinent part:

> Whenever an order authorizing interception is entered pursuant to this chapter, the order may require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception. Such reports shall be made at such intervals as the judge may require.

A judge's decision to require progress reports under this section, which are designed to evaluate the need for continued surveillance, is completely discretionary. *See United States v. Crozzoli*, 698 F.Supp. 430, 437 (E.D.N.Y.1988). Here, Judge Weinshienk's Order required the Government to submit progress reports on the "tenth, twentieth and thirtieth days following the date the Order [was] entered[.]" *See, e.g.,* Order of Apr. 18, 2001, p. 6. I disagree with the Defendants' contention that the missing Eighth Day Report warrants the suppression of evidence. *See United States v. Scafidi*, 564 F.2d 633, 641 (2nd Cir.1977) (holding that a failure to adhere to the reporting requirement does not warrant automatic suppression of tapes). Rather, it is within my discretion to order sanctions after taking into consideration whether there has

been a demonstration of prejudice by any of the Defendants. *Id.* No prejudice having been shown or alleged here, and because the wiretap terminated ten days later, I deny the Defendants' request to suppress evidence based on the missing ten-day report.

## VII. Minimization

 Title 18, section 2518(5) requires that wiretaps "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter[.]" *See also United States v. Killingsworth*, 117 F.3d 1159, 1165 (10th Cir.1997). This provision "does not create an 'inflexible rule of law,' but rather demands an evaluation of the 'facts and circumstances of each case.'" *Garcia*, 232 F.3d at 1316 (quoting *Scott v. United States*, 436 U.S. 128, 139–40, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)). The "[d]etermination of proper minimization is analyzed under a reasonable standard." *United States v. Earls*, 42 F.3d 1321, 1325 (10th Cir.1994).

 "The Government's minimization efforts are evaluated based upon 'the reasonableness of the agents' efforts to refrain from monitoring conversations deemed non-pertinent to the investigation.'" *Small*, 229 F.Supp.2d at 1207 (quoting *United States v. Willis*, 890 F.2d 1099, 1101 (10th Cir.1989)). The Tenth Circuit articulated the procedure for evaluating the reasonableness of the agents' efforts at minimizing non-pertinent telephone calls in *Willis*. 890 F.2d at 1101–02. As an initial matter, the Government must make a prima facie showing of reasonable minimization. *Id.* at 1102. If the Government makes a prima facie showing, the "burden then shifts to the defendant[s] to show more effective minimization could have taken place." *Id.* (citing *United States v. Armocida*, 515 F.2d 29, 45 (3rd

Cir.1975)). In *Willis,* the court found the Government's efforts reasonable where seventy percent of non-pertinent calls over two minutes were minimized. *Id.*

The Government has submitted several exhibits to the Court reflecting, *inter alia,* the total number of calls received on each wiretap, the number of minimized calls and the number of non-pertinent calls that were not minimized—for calls greater than two minutes and for calls greater than three minutes. *See* Govt. Ex. 3—7. The Defendants first argue that the Government's statistical data regarding the number of minimized calls is flawed, and therefore inadmissible. *See* Def. Schey Mot., July 1, 2002, p. 4. Furthermore, they claim that Agent Roach "altered the database" in an alleged attempt to "bolster the minimization rate." *See* Def. Schey Mot., May 20, 2002, p. 2. Given the disparities in the underlying data provided by the Government, the Defendants claim that I cannot perform the *Willis* minimization calculations. Accordingly, they urge me to find that the Government failed to meet its burden to provide adequate evidence of minimization in this case.

My review of the record, however, does not support the Defendants' criticism of the Government's calculations. Defendant Schey makes much of the fact that there are over 1,000 fewer completed calls on Government Exhibits 3 and 6 than the sum total of the ten-day reports. *See* Def. Schey Mot., July 17, 2002, p. 4 n. 3. Agent Roach, however, testified at the May 29, 2002, hearing, that this discrepancy resulted from a default mechanism in the computer software used by agents in the investigation. He testified that it was not apparent "until part way through the wiretap that the computer defaulted all calls to completed unless you check a box saying 'call not completed.'" Tr. of May 29, 2002, p. 584. As a result, the ten-day reports reflect a greater number of completed calls than were actually completed during the investigation. Agent Roach explained that in preparation for the wiretap hearings, he went back through all of the calls and manually checked the box for "call not completed" where the computer had incorrectly defaulted a call to "completed." *Id.* at 584–85. Thus, the Government's Exhibits more accurately reflect the number of calls completed during the investigation.

In addition, Agent Roach explained the discrepancies between the number of minimized calls set forth in the ten-day reports and the number of minimized calls set forth in the Government's Exhibits. Agent Roach testified that when he manually tabulated the ten-day reports, he misunderstood how the computer generated minimization statistics. *Id.* at 479. For calls received when a monitor was not present—the nighttime calls discussed *supra*—the computer displayed these calls as having been minimized. *Id.* at 479, 587–88. Agent Roach therefore manually counted these calls as minimized when preparing the ten-day reports. *Id.* at 479. In actuality, however, because no audio is recorded for these calls, the computer does not count these calls as minimized. *Id.* at 480. Accordingly, the Government's Exhibits, which were generated by the computer, reflect a lower number of minimized calls than the ten-day reports. *Id.* at 480, 587; *see also* Govt. Ex. 3, 6.

More importantly, however, Agent Roach was not able to alter the record of whether a call was minimized or not minimized when preparing and correcting the Government's Exhibits. Agent Roach testified that:

> The permanent record is made when the audio comes in and there is no possible way that that audio can be changed. It is a permanent record in the database. The audio can never be changed, amended by us. The only changes that could

be made by us go to the compilation of the statistics, as we discussed at the prior part of this hearing and today. The audio itself cannot and has not been changed.

Tr. of May 29, 2002, p. 487. Therefore, having concluded that the Government's data is reliable and that the Defendants' claim that Agent Roach "altered the database" is baseless, I will now consider the minimization percentage under *Willis* for each wiretap together with the facts and circumstances of this case to determine the reasonableness of the agents' minimization efforts.

The minimization rates calculated under *Willis* for calls in excess of two and three minutes respectively were introduced into evidence by the Government as follows: First Wiretap—40%, 100%; Second Wiretap—85.2%, 94.9%; Third Wiretap—(Subject Telephone Three) 60%, 100%, and (Subject Telephone Four) 72.6 %, 86.2%; Fourth Wiretap—44.4%, 66.7%; Fifth Wiretap—0%, N/A; Sixth Wiretap—64%, 88.2%; Seventh Wiretap—100%, 100%; Eighth Wiretap—48.6%, 69%; Ninth Wiretap—85.4%, 88.5%; Tenth Wiretap—0%, 0%; Eleventh Wiretap—39.4%, 60%; Twelfth Wiretap—100%, 100%.[11] *See* Govt. Ex. 4, 5 and 6; Tr. of Apr. 30, 2002, pp. 70–82; Tr. of May 29, 2002, pp. 478–87.

To the extent that the minimization percentages are lower than standards for reasonableness recognized in *Willis* (seventy percent), I still find that the rates realized in this case fall within the bounds of reasonableness, based on a careful examination of the record and given the particular facts of this case discussed *infra.* For some of the wiretaps, the low minimization rate is attributable to the unusually small number of calls that were used to calculate the minimization percentage.[12] And as to the low minimization percentage generally reflected throughout the various wiretaps on Mark Williams's phones, Agent Roach testified that the figure resulted in part from the fact that virtually all of the calls were to individuals involved in drug trafficking. *See* Tr. of Apr. 30, 2002, p. 76.

The Defendants also misapprehend the import of the minimization percentages. To the extent that the Defendants contend that the evaluation of statistical data is the *sine qua non* of the minimization requirement, their contention is unfounded. While courts have used statistics as one factor in evaluating the minimization requirement, the Supreme Court has indicated that courts should not evaluate the reasonableness of the Government's minimization efforts in "blind reliance" on the percentage of non-pertinent calls intercepted. *See Scott,* 436 U.S. at 140, 98 S.Ct. 1717. Rather, both Supreme Court and Tenth Circuit precedent instruct that courts should evaluate "several 'factors' in determining that the law enforcement officers properly minimized interceptions" in a given case. *Killingsworth,* 117 F.3d at 1165 (quoting *Scott,* 436 U.S. at 141, 98

---

**11.** N/A—not applicable—means that zero calls fit the category, *i.e.,* non-pertinent calls longer than three minutes were not minimized. *See* Tr. of Apr. 30, 2002, p. 82.

**12.** For the First Wiretap, there were five non-pertinent calls in excess of two minutes, and two of these calls were minimized, resulting in a forty percent minimization rate. Tr. of Apr. 30, 2002, pp. 74–75. Similarly, for both the Fifth and Tenth Wiretaps, the Government intercepted four non-pertinent calls in excess of two minutes, and none of these calls was minimized, resulting in a zero percent minimization rate. *Id.* at 76–78. Not only do I find this sample of calls to be statistically inadequate to cross the threshold of reliability necessary to perform the *Willis* calculations, Agent Roach explained that four calls on the Tenth Wiretap were between Defendants Jason and David Price—both drug traffickers who often engaged in drug trafficking talk. *Id.* at 78.

S.Ct. 1717). I will analyze several of these factors below.

■ First, the court should "consider[ ] the 'circumstances of the wiretap' at issue" including the "nature and scope of the criminal enterprise under investigation." *Id.* Where the focus of the investigation is a widespread conspiracy, as opposed to a single criminal episode, less minimization is required. *Scott,* 436 U.S. at 140, 98 S.Ct. 1717; *Killingsworth,* 117 F.3d at 1165–66. Because the investigation here clearly targeted a broad conspiracy, I find that the Government's minimization burden is necessarily lessened.

■ Courts may additionally consider the "point during the authorized period [that] the interception was made." *Scott,* 436 U.S. at 140, 98 S.Ct. 1717. The Government is permitted significantly more leeway in the initial stages of interception when it is "difficult to determine which calls are relevant and which are irrelevant." *Killingsworth,* 117 F.3d at 1166 (citing *Scott,* 436 U.S. at 141, 98 S.Ct. 1717). The majority of the objections to the Government's minimization showing are mounted by Defendant Schey, who focuses her criticism on the first two wiretaps, 01–WT–1–Z and 01–WT–2–K. While the corrected calculations offered by Agent Roach for the first wiretap reflect a forty percent minimization rate, as discussed previously, the percentage was calculated from only five telephone calls, a statistically inadequate sample size. It is also significant that the Government generally increased its minimization rates, from these initial wiretaps as the investigation progressed, with the exception of the Mark Williams wiretaps. I find this to be further proof that the efforts made by the Government to minimize the interception of non-pertinent telephone calls were reasonable.

■ The interceptees' use of coded language constitutes another relevant factor for courts to consider. *Scott,* 436 U.S. at 140, 98 S.Ct. 1717. Agent Roach testified that the Defendants, especially Mark Williams, used coded language during the telephone conversations. Agent Roach stated that:

> [Mark Williams] and his associates spoke extremely cryptically in their conversations, using code. I think the example I gave previously was we began intercepting him in April, had thousands and thousands and thousands of calls and did not know until August [ ] that he was even dealing methamphetamine. We knew he was dealing ecstasy. We suspected he was dealing another drug. Based on the way he talked, we didn't even know it was methamphetamine until the final weeks of the investigation.

Tr. of May 30, 2002, p. 651. Agent Roach further testified that Mark Williams also engaged in surreptitious coded conversations with Ceja–Ponce and Hynes. *Id.* at 655; Tr. of Apr. 30, 2002, p. 135. The record reflects that the terminology of the Defendants in this case was coded and ambiguous. As such, the Government's minimization burden should be lessened accordingly.

■ Courts may additionally consider whether the issuing judge supervised the interceptions. *United States v. Quintana,* 508 F.2d 867, 875 (7th Cir.1975). "Where the judge has required and reviewed such reports at frequent intervals, courts have been more willing to find a good-faith attempt to minimize unnecessary interceptions." *Id.* (citing cases). Here, each Order required the Government to submit progress reports on the tenth, twentieth and thirtieth days following the date the Order was entered. *See, e.g.,* Order of Apr. 18, 2001, p. 6. The record reflects that the Government complied with this requirement and kept the issuing judge advised of all significant developments for

each wiretap, with the exception of the missing ten-day report discussed *supra.* The ten-day reports detailed the number of calls minimized, the number of pertinent calls and the total number of calls intercepted. Moreover, starting with the 01–WT–09, the first wiretap on Mark Williams's telephone, the Government provided the issuing judge with a summary of every pertinent call intercepted.[13] *See* Tr. of May 29, 2002, p. 492. I find that the Government has demonstrated a good faith attempt to comply with the minimization requirement by submitting the foregoing information to the issuing judges in this case. *See Quintana,* 508 F.2d at 875.

 Based on the foregoing, I conclude that the Government made a prima facie showing of reasonable minimization. The burden therefore shifts to the Defendants "to show more effective minimization could have taken place." *Willis,* 890 F.2d at 1102. The Defendants have not even attempted to make such a showing, relying instead on a global attack on the reliability of the Government's data, which I have rejected. Consequently, my review of the record establishes that the agents made a good faith reasonable effort to minimize conversations that were not pertinent to this investigation.

Defendant Schey also claims that agents did not minimize her individual calls. In several of her submissions to the court, Defendant Schey contends that "none of [her] conversations were [*sic*] minimized, even though at times she was engaging in non-pertinent conversations." *See, e.g.,* Def. Schey Mot., Aug. 6, 2002, p. 5. At the hearing, Agent Roach testified that he was not certain whether any of Defendant Schey's calls had been minimized. Further, Defendant Schey did not provide copies of the transcript for these calls for the Court to evaluate. Because Defendant's

own counsel admitted that there were only a "few intercepted calls in both the first and second wiretap" that involved Defendant Schey, I can not say on the record before me that the Government minimization efforts related specifically to Defendant Schey were unreasonable. The Defendant has failed to make a showing as to how more effective minimization could have taken place here. Rather, she has obliquely referred to a "few calls" that occurred in the early stages of the investigation wherein she conversed with Defendant Sposit's girlfriend. Defendant Schey's specific objections are therefore denied. *See Scott,* 436 U.S. at 140, 98 S.Ct. 1717 ("statute does not forbid the interception of all nonrelevant conversations").

## VIII. CONCLUSION

Based on the foregoing, it is

ORDERED that Defendant John D. Sposit's Motion to Suppress Title III Interceptions filed in 01–CR–318–D on February 25, 2002, is **DENIED.** It is

FURTHER ORDERED that Defendant John D. Sposit's Motion to Suppress Title III Interceptions filed in 01–CR–319–D on February 25, 2002, is **DENIED.** It is

FURTHER ORDERED that Defendant Megan M. Schey's Motion to Suppress Evidence Obtained by Wiretap filed in 01–CR–319–D on February 22, 2002, is **DENIED.** It is

FURTHER ORDERED that Defendant Ryan J. Krueger's Motion to Suppress Intercepted Wire Communications filed in 01–CR–319–D on February 22, 2002, is **DENIED.** It is

FURTHER ORDERED that Defendant Frank E. Edmonds's Motion to Suppress

---

**13.** With the exception of a thirty-day period of Radosavljevic's calls where Agent Roach provided Judge Weinshienk with summaries of selected calls. Tr. of May 29, 2002, p. 492.

Wiretap Evidence filed in 01–CR–319–D on February 22, 2002, is **DENIED**. It is

FURTHER ORDERED that Defendant Liana R. Parisi's Motion to Suppress Wire Communications filed in 01–CR–319–D on February 22, 2002, is **DENIED**. It is

FURTHER ORDERED that Defendant Chad D. Kelly's Motion to Suppress Wire Communications filed in 01–CR–320–D on February 22, 2002, is **DENIED**. It is

FURTHER ORDERED that Defendant Juan Jose Ceja–Ponce's Motion for Suppression of Wiretap filed in 01–CR–320–D on February 14, 2002, is **DENIED**. It is

FURTHER ORDERED that Defendant Jason M. Price's Motion to Suppress Evidence Derived from Interception of Electronic Communications filed in 01–CR–320–D on February 25, 2002, is **DENIED**. It is

FURTHER ORDERED Defendant Jimmy D. Graham's Motion for Suppression of Wiretap filed in 01–CR–320–D on February 14, 2002, is **DENIED**. It is

FURTHER ORDERED that Defendant Donovan Garcia's Motion to Suppress Evidence Obtained by Illegal Wiretap filed in 01–CR–320–D on February 22, 2002, is **DENIED**. It is

FURTHER ORDERED that Defendant Jason M. Price's Motion to Suppress Evidence Derived from Interception of Electronic Communications filed in 01–CR–350–D on February 25, 2002, is **DENIED**. It is

FURTHER ORDERED that Defendant Chad Vice's Motion to Suppress Wiretap and Supplemental Brief Regarding Wiretap filed in 01–CR–350–D on January 24, 2003, is **DENIED**.

FURTHER ORDERED Defendant Juan Jose Ceja–Ponce's Motion for Suppression of Wiretap filed in 01–CR–359–D on February 14, 2002, is **DENIED**. It is

FURTHER ORDERED and Defendant Brail Medina–Garcia's Motion to Suppress Wire Communications filed in 01–CR–359–D on February 22, 2002, is **DENIED**.